Argued October 31, 1950; modified January 17, 1951

# OLIVER *v.* SKINNER AND LODGE

226 P. (2d) 507

426

*P. J. Gallagher* argued the cause for respondent and cross-appellant. On the brief were Gallagher & Gallagher, of Ontario.

*Anthony Yturri,* of Ontario, argued the cause for appellants. With him on the brief was Walter Griffiths, of Caldwell, Idaho.

Before Lusk*, Chief Justice, and Brandt†, Rossman, Hay and Warner, Justices.

HAY, J.

This is a suit to enjoin defendants from diverting water from a certain lake, to the detriment of plain-

---
* Chief Justice when this case was argued.
† Chief Justice when this opinion was rendered.

tiff's allegedly superior rights to such water. The original plaintiff, John A. Oliver, died subsequent to the hearing, and Mina M. Oliver, his widow, who is administratrix of his estate, has been substituted as plaintiff.

The lake in question is called Upper Cow Creek Lake. It is situated in the east central portion of Malheur County, Oregon. It is fed by a number of small streams, of which Cow Creek is the most important. During periods of high water, the lake overflows toward the south, forming a stream which is considered as being a continuation of Cow Creek, and bears that name. This stream is a tributary of Jordan Creek, which is a tributary of the Owyhee River.

It appears that Earl Skinner was joined as a defendant only because, when the suit was commenced, he was in charge of the Lodge property as Mr. Lodge's employee. Mr. Lodge therefore will be referred to as if he were the sole defendant.

The complaint, among other matters, alleged as follows: Heretofore, the method of irrigating Lodge's land has been to put dams in the streams and thereby force the water over the land, and to utilize the high water of the lake above its natural level. During the spring of 1939, defendant Lodge changed his point of diversion of Cow Creek water for irrigation of his land and changed his method of irrigation. He constructed a canal or channel to carry the water of Cow Creek directly into Upper Cow Creek Lake, and permitted the surplus run-off of said stream to flow directly into the lake. The surface of the lake was thereby caused to rise above the level of the lava barrier, and the run-off water thereby escaped and

went down the stream without being used for irrigation upon Lodge's land. Following the spring run-off, the level of the lake returned to the level of the barrier, and thereafter defendant Lodge, without any right to do so, began to pump water from the lake onto his land. By such pumping defendant has diverted and will continue to divert from the lake large quantities of water naturally impounded therein, has lowered and will continue to lower the natural surface of the lake, and thereby has deprived and will continue to deprive plaintiff of water that he is entitled to receive under the Owyhee River Adjudication decree and under appropriations and permits from the state engineer. When said water naturally stored in the lake is unmolested, it is sufficient in quantity for the irrigation of plaintiff's land and for his stock and domestic requirements, but when interfered with by defendant in the manner aforesaid plaintiff's land cannot be irrigated, his crops and pasturage are damaged and destroyed, and his water for stock and domestic purposes reduced, to his great loss and damage.

The complaint alleges, further, that no use was ever made by defendant or his predecessors of the water of the lake after the level thereof had reached the elevation of the top of the lava barrier; that the natural storage capacity of the lake is about 2,000 acre feet; that during the irrigation season the lake loses about 65 per cent of its water through leakage, seepage and evaporation; that all of the natural storage of the lake is necessary for the irrigation of plaintiff's land; that defendant's rights are inferior to plaintiff's in the use of the water of the lake; and that defendant is estopped, by decree in a former suit between certain of defendant's predecessors in interest

and plaintiff Oliver herein, from claiming any rights to said lake water superior to plaintiff's rights therein.

The complaint prays for a decree "establishing the normal level of said * * * Upper Cow Creek Lake, at a point 32 inches above the bottom" of the ditch through which plaintiff diverts the water of the lake to his use, enjoining defendant from taking or diverting from said lake any of the water naturally stored therein below the level of the top of said lava barrier, and awarding plaintiff damages in the sum of $2,000.00.

Defendant answered, in the main, by general denial, with affirmative allegations as follows: His land was formerly irrigated by means of dams placed in the channel of Cow Creek. During normal years and years of excessive moisture, profitable crops were produced by this method of irrigation. During seasons of less than normal precipitation, the water of Upper Cow Creek Lake was permitted to remain at its natural level, and produced profitable crops upon defendant's land by subirrigation. In later years, and during short water seasons, plaintiff began pumping the water from the lake, and thereby lowered the water level, lowered the water table under defendant's land, and reduced the quantity and depreciated the quality of defendant's crops. After plaintiff commenced pumping, it became necessary for defendant to improve his system of irrigation, by pumping or otherwise, to "make effective the rights granted" defendant by the Owyhee River Adjudication decree. The construction of a new channel from Cow Creek, and the irrigation of the defendant's land by the use of pumps, as complained of by plaintiff, "will not cause any appreciable or noticeable lowering of the normal water level in said Lake", and "the conduct and course of irrigation

contemplated'' by defendant ''will not in any manner adversely affect or injure'' plaintiff's rights, or ''in any manner serve to make more difficult or inconvenient the use of water by the plaintiff''. Regardless of defendant's conduct, plaintiff has been and will be forced to pump water from the lake during the dry season. During ordinarily dry years, the level of the lake will fall to a point below the bottom of plaintiff's ditch. The method of irrigation heretofore followed on plaintiff's land caused a large portion thereof to become waterlogged and water soaked to the extent that ''the occupants of said premises have been unable to utilize the full fertility and productivity of said lands.'' In dry years, subsequent to the draining of the flood waters from defendant's land into the lake, the land is without water until late fall or winter months when water again commences to flow in Cow Creek. In dry years there is no way in which defendant ''may utilize or make effective the water rights granted to his predecessors in interest'', except by the improved method of irrigation which he has adopted. The decree in the Owyhee River Adjudication entitles defendant to use for any beneficial purpose one-half acre foot of water per acre during each of the months of June, July, August, September, and to the 15th day of October of each year. In dry years, defendant cannot avail himself of the rights so granted, except by resorting to said improved method of irrigation. In dry years, if defendant relies upon the flood waters in the early spring months or late fall and winter months, he ''will remain without water for irrigation during the months set forth in said decree.'' Defendant will be enabled to increase the fertility and productivity of his land ''only by applying and placing water

upon the said premises during the spring and summer months.'' He can reclaim his water-logged and water-soaked lands ''only by preventing the flooding of said premises during the early spring and late fall and winter months.'' By retaining or continuing the ''flood system'' of irrigation, defendant's land will be capable of producing only native grasses, and grasses or crops containing very little nutritious value for livestock, but by applying water on the premises ''as provided for in said decree'' during June, July, August, September, and until October 15, in quantities not exceeding one-half foot per acre per month, defendant can and will be able to produce valuable tame or domestic crops such as alfalfa, clover, timothy, etc. The construction of the new channel for said creek, and the course of irrigation proposed to be followed by defendant, will cause the lake to remain at a higher level during the irrigation season, ''and waters which ordinarily evaporate, seep and are wasted by spreading out and flooding out over defendant's land, will be confined within said Lake.'' Defendant will not use a greater amount of water than was granted his predecessors by said decree, and in fact is using and will use a smaller amount than is ordinarily used during normal years by the ''flood system'' of irrigation. The mode of irrigation to be established by defendant ''is merely an improvement and modernization of defendant's system of irrigation, is in keeping with good husbandry, and will prevent the loss, waste, evaporation and seepage of water, which has occurred heretofore in the spring and late fall and winter months,'' and defendant ''will therefore preserve water in said Lake which would otherwise be lost.''

Plaintiff's reply puts in issue the affirmative allegations of the answer.

The suit was permitted to languish by the parties during the war years, and thereafter, on August 25, 1947, plaintiff, by permission of court, filed a supplemental complaint seeking to recover damages for the years 1940 to 1946, inclusive, in the aggregate sum of $38,000.00.

In October, 1947, the trial judge, at the request of the parties, made a personal visit of inspection to the land involved in the suit. On February 2, 1948, the cause was heard by the court. During the hearing, in addition to other evidence received, it was stipulated by the parties that predecessors in interest of defendant diverted waters of Cow Creek, Schnabel Creek, Cove Creek, Mahogany Creek, and Upper Cow Creek Lake, and put such waters to beneficial use in the irrigation of land now belonging to defendant; that, in a proceeding in the Circuit Court for Malheur County, entitled "In the Matter of the Determination of the Relative Rights to the Use of the Waters of the Owyhee River and its Tributaries", predecessors in interest of defendant filed claims to the use of said waters; that, in due course, a decree was entered in said proceeding by said circuit court, by which decree defendant's said predecessors were adjudged to be entitled to the use of such waters as follows: From Cow Creek, with a priority date of 1879, for 125 acres of land in section 25, township 28 south, range 44 E. W. M.; from Cove Creek, with a priority date of 1872, for 115 acres in section 14, said township and range; from Schnabel Creek with a priority date of April, 1886, for 269.1 acres in sections 15, 22, 25 and 36, said township and range; and from Cow

Creek, Upper Cow Creek Lake, and two springs on the S. W. ¼ S. E. ¼ of section 14, said township and range, with a priority date of 1872, for 526.5 acres in sections 14, 15, 22, 23, 24, 25 and 26, said township and range; that by said decree plaintiff, John A. Oliver, was adjudged to be entitled to the use of 7.18 cubic feet per second of water from Cow Creek and Upper Cow Creek Lake, with a priority date of March 16, 1907, for the irrigation of 277.1 acres in sections 11 and 14, township 29 south, range 44 E. W. M.; that on March 7, 1923, plaintiff, John A. Oliver, applied to the state engineer of the state of Oregon for the right to appropriate water naturally stored in Upper Cow Creek Lake, and, on or about June 4, 1930, said state engineer issued to said plaintiff a certificate of such water right, with a priority of March 7, 1923, for 5.05 cubic feet of water per second for use for irrigation purposes upon a portion of the 277.1 acre tract above mentioned, and other lands comprising 110.9 acres; that the method of irrigation used by defendant Lodge's predecessors in interest was to put dams in the bed of Cow Creek, Schnabel Creek and Cove Creek and thereby, during the run-off season, force the water of such streams over the land now owned by Lodge, and also to utilize the waters of Upper Cow Creek Lake to subirrigate such land; that the water so diverted upon such land gradually drained off therefrom into the lake; that the lake is formed by water collected behind a lava barrier which forms the southern boundary thereof; that defendant's land borders upon the lake; that the run-off of the streams tributary to the lake is sufficient in an average year to fill the lake so that water will spill over the barrier; and that the point where such water overflows the barrier is the highest level at

which the water of the lake stands after the spring run-off.

In due course, the court made findings of fact in favor of the plaintiff and conclusions of law based thereon, upon which, on October 31, 1949, it entered a decree, *inter alia*, as follows: Limiting the rights of the defendant Lodge to the use of the waters of Cow Creek, as against the rights of plaintiff, to the natural flow of the stream prior to July 1 of each year to the extent and in the amount fixed by the Owyhee River Adjudication decree; decreeing that plaintiff's rights are superior and prior in time to any right of defendant to the use of all waters of Cow Creek flowing in said stream after July 1 of each year, except use thereof by defendant for stock water and domestic purposes; enjoining defendant from withdrawing or using any of the water of Cow Creek after such water has passed into Upper Cow Creek Lake, except for stock and domestic purposes; enjoining defendant from diverting and using any of the water of Cow Creek for the irrigation of any of his land at any time after July 1 of each year, and from withdrawing from or using for irrigation purposes any of the water of said stream which has "passed into that part of Cow Creek, known as Upper Cow Creek Lake"; enjoining defendant from using the canal now used by him to withdraw the water of said lake to his pump; and decreeing that, by the former suit entitled *J. W. Strode and John Kiernan Corporation v. John A. Oliver,* defendant N. C. Lodge, as the successor in interest of John Kiernan Corporation, is estopped "from making any use of the water of Cow Creek or Upper Cow Creek Lake for irrigation purposes which will diminish or impair the amount of water decreed to John A. Oliver for his use,

to-wit: 7.18 second feet of water under the appropriation of said Oliver and 5.05 second feet of water awarded to said Oliver, under his Engineer's Permit, except that said defendant N. C. Lodge and his successors shall have the prior right to use the natural flow of Cow Creek prior to July 1st of each year''.

The defendant has appealed from said decree.

The defendant complains that the trial court erred in finding that no lake water was used in the irrigation of the Lodge lands. This erroneous finding, he says, is the basic premise upon which the whole decision rests. It was, of course, stipulated that defendant's predecessors used some water from the lake. The evidence, moreover, indicates that during the spring freshets the lake overflowed its banks to a greater or lesser extent, and partially inundated Lodge's land. There was also evidence of some subirrigation. However, by July 1st or thereabouts, the lake had subsided to the elevation of the barrier or lower, and defendant's predecessors, and defendant himself until he changed his method of irrigation, were accustomed to open their temporary dams and permit the water which they had caused to stand upon their meadows to drain off into the lake, so that they might harvest their hay crop. The water so released was never recaptured by Lodge or his predecessors. The evidence shows that, except for occasional rains, no water whatever was available, whether from the lake or from the stream, for the irrigation of Lodge's land after July 1st, unless and until the streams rose in the late fall. There is some evidence that Lodge's predecessors maintained a rock dam on the east border of the lake, in which a gate was installed, through which the lake water could be allowed to overflow onto the lands or drain back

into the lake as occasion required and the lake level permitted. There was also evidence that a system of ditches connected together a number of sloughs upon the land, which ditches and sloughs facilitated the spreading of the water over the land.

■ The fact that the original method of irrigation was a crude one did not prevent it from being a lawful appropriation of water to a beneficial use. *McCall v. Porter,* 42 Or. 49, 55, 70 P. 820, 71 P. 976; *Re Rights to Waters of Silvies River,* 115 Or. 27, 36, 66, 94, 237 P. 322; *Hough v. Porter,* 51 Or. 318, 419, 95 P. 732, 98 P. 1083. The evidence shows that this crude method of irrigation was followed during the whole period from 1872 until the time of the beginning of the present dispute.

■ The court, in the Owyhee River Adjudication, having decreed that the irrigation season for the area in question extends from April 15 to October 15 of each year, defendant makes the ingenious argument that ''it must be said that the Lodge lands were using water from both the Lake and the Creek during the full irrigation season, and even with the introduction of pumping, they are still continuing to apply water upon the same Lodge lands from the very same sources and during the same season of the year.'' This argument is fallacious. No water was used by Lodge's predecessors for the irrigation of their land after about July 1st, when, for the purpose of harvesting their hay crop, they released the impounded water into the lake. Their appropriation, therefore, as we shall show, was limited in time to the actual period of the year during which they put the water to a beneficial use.

■ The scope of the first appropriation is the meas-

ure of the right. *Simmons v. Winters,* 21 Or. 35, 42, 51, 27 P. 7; *Mattis v. Hosmer,* 37 Or. 523, 529, 62 P. 17, 632; *Hough v. Porter,* supra, 51 Or. 318, 425, 95 P. 732, 98 P. 1083; *In re North Powder River,* 75 Or. 83, 94, 144 P. 485, 146 P. 475; *Hutchinson v. Stricklin,* 146 Or. 285, 300, 28 P. 2d 225; *McCall v. Porter,* supra, 42 Or. 49, 57, 70 P. 820, 71 P. 976; 2 Kinney on Irrigation and Water Rights, 2d ed., p. 1366, § 784.

■ ■ Defendant admits that an appropriation of water is limited by the scope of the original appropriation, but, he says, this rule applies to Oliver's appropriation as well as to his. This, of course, is true. Oliver is not entitled to the use of any more water than was contemplated within the scope of his original appropriations, respectively. If, as Lodge contends, the lake contains more than sufficient water for Oliver's appropriations, then of course Lodge would be entitled to appropriate any unappropriated surplus remaining.

■ It was said by this court in the case of *In re Waters of Umatilla River,* 88 Or. 376, 380, 397, 168 P. 922, 172 P. 97, that it was the manifest intention of the water code to require that an appropriator of water should, at the time of making his appropriation, have in mind a definite limited scheme for the beneficial use of such water. See also *Nevada Ditch Co. v. Bennett,* 30 Or. 59, 91, 45 P. 472; *In re Waters of Deschutes River,* 134 Or. 623, 644, 286 P. 563, 295 P. 1049. The appropriator is, of course, allowed a reasonable time to complete the application of the appropriated water to the contemplated beneficial use. What constitutes such reasonable time depends largely upon the size of the project. The original appropriator of the water rights now owned by defendant, however, obviously

had no intention of enlarging the scope of his appropriation within a reasonable time after the date of such appropriation, or at all. He and his successors in interest, down to and including defendant, followed the original method of irrigating the lands by flooding them and raising thereon crops of tule grasses and wild hay for sixty-seven years before defendant inaugurated his improvements. The elaborate system of irrigation now put into operation by defendant is, in effect, an attempted new appropriation, and is inferior to the rights of the plaintiff, John A. Oliver, which accrued between the time of the original appropriation for the Lodge lands and such attempted new appropriation. *Tudor v. Jaca,* 178 Or. 126, 158, 164 P. 2d 680, 165 P. 2d 770; *Lobdell v. Simpson,* 2 Nev. 274, 279, 90 Am. Dec. 537; *Nevada Water Co. v. Powell,* 34 Cal. 109, 118, 91 Am. Dec. 685.

Defendant's argument in this connection is that, when his predecessors commenced using water for the irrigation of their lands, they intended to use an amount sufficient to provide adequate irrigation and produce crops and pasture. He says that as long as there was sufficient water in the lake for those purposes, his predecessors could not complain of any use made by Oliver of any surplus lake water. He complains that Oliver not only claims the right to use "the top layer" of water of the lake, but that he denies the right of anyone else to use the bottom layer. This argument assumes, first, that Mr. Lodge's change in method and time of irrigation involves no detriment to Oliver's rights, and, second, that actually there is a surplus of water in the lake available for use over and above the amount necessary to satisfy Oliver's rights.

■ As to whether or not water released and permitted to drain into the lake by defendant and his predecessors after irrigation of their land was free water, abandoned by them without any intention of recapturing it, the parties disagree. The defendant argues that there never was any intention on the part of his predecessors or himself to abandon the released water. We presume he is referring to that water which, in periods of high water, overflowed the banks of the lake and inundated all or part of Lodge's land. He says that such water was allowed to return to the lake because the occupants of the land knew that it would percolate under the land and so subirrigate it. Such subirrigation, Mr. Lodge contends, was accepted by himself and his predecessors as a "gift of nature", and hence was a beneficial use of the water, and therefore that the release of the water was in no sense an abandonment thereof. Plaintiff, on the other hand, when he talks about an abandonment of the water, seems to have reference to the water of Cow Creek which was spread over the Lodge land before reaching the lake and which was thereafter, by removal of the temporary dams which caused it to spread, permitted to drain into the lake. As to the water of Cow Creek which was spread over the Lodge land by damming the stream, we think that there is no question but that the release of such water by defendant and his predecessors, without any intention to recapture it, constituted an abandonment thereof. *Jones v. Warmsprings Irrigation District,* 162 Or. 186, 195, 196, 197, 91 P. 2d 542. Defendant, it would seem, concedes this proposition, for his argument lays its greatest emphasis upon the subirrigation effected by percolation of the lake water under his land. If the argument involves a claim of right to have the lake

maintained at its normal summer level,—i. e., the elevation at the top of the barrier—without depletion by the exercise of Oliver's rights, then we disagree. If, as defendant asserts, Mr. Oliver was not entitled to require that "the bottom layer" of the lake be not disturbed, in order that Oliver might be able to divert the "upper layer" by gravity flow through his ditch, then by parity of reasoning, Mr. Lodge is not entitled to have the lake maintained at a level sufficient to supply him with water for the subirrigation of his lands by percolation. Moreover, Mr. Lodge's predecessors, in their Statement and Proof of Claim in the Owyhee River Adjudication, referring to the initiation of defendant's water right, in answer to the question: "What steps were taken by this claimant or his predecessor in interest to initiate said right?" stated: "By daming [sic] Cow Creek causing it to flood land and irrigate same, theby [sic] producing a crop of wild hay." Defendant's present contention, however, seems to regard the lake as a storage reservoir into which, as he asserts, his predecesors permitted flood waters, and water which had been spread upon their land for irrigation, to flow, with the intention of recapturing it through the action of natural percolation from the lake under the surface of their land. There is no showing whatever that Lodge's predecessors ever claimed such a right.

▮▮▮▮ An appropriator will not be permitted to divert or hold more water than he can put to a beneficial use within the limits of the measure of his appropriative rights. *In re Water Rights of Owyhee River*, 124 Or. 44, 47, 259 P. 292; *Claypool v. O'Neill*, 65 Or. 511, 514, 133 P. 349; *Simmons v. Winters*, supra, 21 Or. 35, 43, 27 P. 7. His system of diversion and distribution

need not be perfectly efficient; it is sufficient if they are reasonably so. *State ex rel. Crowley v. District Court,* 108 Mont. 89, 88 P. 2d 23, 121 A. L. R. 1031, 1041. He is entitled to hold and divert, as incident to his appropriative rights, such amount of water as may be reasonably necessary to take care of normal storage and transportation losses. *Tudor v. Jaca,* supra, 178 Or. 126, 147, 164 P. 2d 680, 165 P. 2d 770.

■ The water of the stream, when released by defendant and his predecessors after having been spread over their land and used to irrigate a crop, was waste water and subject to appropriation by the plaintiff, Oliver. *Vaughan v. Kolb,* 130 Or. 506, 517, 280 P. 518.

■ Defendant cites *Bowles Reservoir Co. v. Bennett,* 92 Colo. 16, 18 P. 2d 313, 315, to the effect that a subsequent appropriator of water from a lake or reservoir makes his appropriation with notice of the existing diversion system of a prior appropriator therefrom. That is sound law. Oliver, in the case at bar, made his appropriations with notice of the prior rights appurtenant to Lodge's land, whatever such rights may have been. By the same token, Oliver, upon making his appropriation, acquired a vested right to insist that the conditions of the measure of the prior appropriation should not thereafter be changed to his detriment. *Broughton v. Stricklin,* 146 Or. 259, 284, 28 P. 2d 219, 30 P. 2d 332; *Tudor v. Jaca,* supra, 178 Or. 126, 158, 164 P. 2d 680, 165 P. 2d 770. Such vested right is recognized by the Oregon statute. § 116-606, O. C. L. A. Defendant admits that the law is as stated, but insists, first, that he is not using any more water than the amount of his decreed water rights, and, second, that Oliver can have suffered no injury, as there was always sufficient water in the lake to satisfy Oliver's

appropriations. Mr. Lodge maintains that his witnesses, who had occasion to observe the level of the water of the lake at different times, testified that Lodge's pumping made no appreciable difference in the lake level; that at no time, except in the dry year of 1947, did the lake level subside to a point at which water would not flow into the Oliver diversion ditch by gravity; and that the testimony of one of such witnesses showed that one-third of the water diverted upon Lodge's land under his improved system of irrigation returns to the lake and thus is made available for Oliver's use. These protestations, so far as they tended to be supported by competent evidence, should properly have been submitted to the state engineer in support of an application for permission to change the point of diversion and place of use under Lodge's appropriation. The witness who testified that one-third of the diverted water was returned into the lake was not qualified to make such an estimate. His testimony to that effect was no more than a guess.

 A prior appropriation of a definite amount of water may be made, limited to use during a definite period of time, and a subsequent appropriator may appropriate a like quantity of water from the same source, for use during another period. *McPhee v. Kelsey,* 44, Or. 193, 201, 74 P. 401, 75 P. 713; *Gardner v. Wright,* 49 Or. 609, 629, 91 P. 286; *Davis v. Chamberlain,* 51 Or. 304, 314, 98 P. 154; *Smith v. O'Hara,* 43 Cal. 371, 1 Morrison, Min. Rep., 674; *Cache La Poudre Reservoir Co. v. Water Supply & Storage Co.,* 25 Colo. 161, 53 P. 331, 333; *Barnes v. Sabron,* 10 Nev. 217, 245; 2 Kinney on Irrigation and Water Rights, 2d ed., p. 1369, § 786; Long, Irrigation, p. 108, § 61. This principle of law, applied to the facts in the present case,

makes Oliver's appropriations prior in right to Lodge's, during the period between July 1 or thereabouts and that time in the fall when water recommences to flow in the creek. Oliver's appropriations are from both Upper Cow Creek Lake and Cow Creek. *Oliver v. Jordan Valley L. & C. Co.*, 143 Or. 249, 264, 265, 16 P. 2d 17, 22 P. 2d 206.

The plea of estoppel by prior adjudication, which was sustained by the court, was based upon a decree in a former suit between J. W. Strode and John Kiernan Corporation, predecessors in interest of Mr. Lodge, as plaintiffs, and John A. Oliver, plaintiff herein, as defendant. The case was tried in the circuit court for Malheur County. The plaintiffs, alleging that Oliver's water rights under the Owyhee River Adjudication and under his pumping permit were subsequent and inferior to their rights, sought to have Oliver enjoined from diverting the waters of Upper Cow Creek Lake either by gravity flow or by pumping. They alleged that Oliver's diversions had deprived them of irrigation for their land through the natural overflow of the lake, a right to which they claimed to have been entitled by priority, as appropriators, as riparian owners, and by adverse possession, and had also deprived their lands of subirrigation from the lake, "which the lands of plaintiffs had been receiving from time immemorial." Oliver met these issues head on, pleading all of his rights exactly as asserted by him in the case at bar, and pleading, moreover, (1) estoppel, in that plaintiffs and their predecessors in interest knew at all times that Oliver was expending large sums of money in developing his irrigation system, and was each year lowering the surface of the lake and claiming and taking water therefrom, and (2) that plaintiffs

and their predecessors in interest had appeared in the Owyhee River Adjudication and filed claims therein as appropriators in respect of their asserted water rights, and had thereby waived any and all riparian rights in the premises. Issue was joined upon these questions, a hearing upon the merits was held, and, on August 27, 1935, the court made a general finding that the equities in the cause were with the defendant Oliver, and entered a decree dismissing the suit.

As Oliver had admitted that he was diverting water from the lake, both by gravity flow and by pumping, as charged by the complaint, and had pleaded his adjudicated right and state engineer's permit as justification in so doing, the only issues that remained for the consideration of the court were (1) plaintiffs' claim of priority of appropriation; (2) a claim by Oliver that his diversions had been continued for a sufficient length of time to establish by adverse possession a right to continue to exercise them; (3) defendant's claim that plaintiffs were estopped by implied license; and (4) defendant's claim that plaintiffs, by appearing in the Owyhee River Adjudication and filing a claim for water rights as appropriators, had waived any and all riparian rights.

A finding in favor of the defendant on any of such issues would have been sufficient to deny plaintiffs the injunctive relief which they sought. The court, however, made no findings, nor was any memorandum opinion filed. The only indication as to what was actually decided is a statement in the preamble of the decree that "based upon the records and files herein and the testimony heretofore taken, the court now finds that the equities in the above entitled cause are with the defendant." The decree then recites "that the

above entitled suit be and the same is hereby dismissed".

In the case at bar, the lower court made a finding that it was determined by the decree in the Strode case that the withdrawal of water from the lake by gravity flow through the Oliver ditch to a level substantially 32 inches below the top of the barrier was not an infringement upon the water rights of the plaintiffs therein, and, further, that the defendant in that case, John A. Oliver, had a right to pump water from the lake under his permit from the state engineer, and that such pumping was not a violation of the water rights of said plaintiffs; that the plaintiffs had no right to the use of the water of the lake as riparian owners, and had no right to have such water maintained at any level for the purpose of causing the plaintiffs' land to be subirrigated thereby. Our own opinion is that the issues in the Strode case were so drawn that, after a hearing upon the merits, a decree dismissing the suit upon the ground that the equities were with the defendant was equivalent to the determination that the plaintiffs were not entitled to the relief claimed or any part thereof. The determination was not made on account of a failure of proof, nor was the decree given without prejudice to another suit by the plaintiffs for the same cause or any part thereof. The decree was therefore a bar to another suit for the same cause, or any part thereof, and it was competent for the plaintiff Oliver herein to plead such decree by way of estoppel by decree or res judicata against the defendant Lodge, who is the successor in interest of the plaintiffs in the Strode case. § 9-208, O. C. L. A.; *Roles v. Roles Shingle Company,* 147 Or. 365, 372, 31 P. 2d 180; 2 Black on Judgments, p. 858, § 720.

The defendant apparently recognizes that the Strode decree was available to the plaintiff by way of estoppel, but contends that the effect of the decree as estoppel is limited to the following: (1) that plaintiffs therein could not claim as riparian proprietors and as appropriators at the same time; (2) that plaintiffs, having made claim as appropriators in the Owyhee River Adjudication, must rely upon their adjudicated right; (3) that plaintiffs had no right to insist upon the lake being maintained at any level in order that they might have the benefit of subirrigation; and (4) that as long as there was sufficient water in the lake for both parties, Oliver had a right to pump water for irrigation purposes. So much being conceded, it necessarily follows that the other contested issues in the Strode case are res judicata also. This includes an issue that the rights of the then defendant Oliver under the Owyhee River Adjudication and by virtue of his state engineer's permit were prior to any right of Lodge's predecessors to the use of the water of Upper Cow Creek Lake.

Defendant apparently believes that because under the Owyhee River Adjudication decree the Lodge land is "allowed to receive" 1049.9 acre feet of water prior to June 1, 262.5 acre feet in each of the months of July, August, and September, and 131.25 acre feet in October, this is the equivalent of a grant of permission to secure that amount of water within the times limited, either from the creek or from the lake, irrespective of the measure of his original appropriation. He inquires: "If, as the Court found, there is no water in Cow Creek after July 1st and if as the Court decreed no water from the Lake can be used under the Lodge lands, just where in the world did the Court propose that

Lodge would get the water decreed to the Lodge lands by the same Court and in the same decree for July, August, September and October of each year?" But the court, of course, did not propose to furnish water for Mr. Lodge. The allowances of water, the limitations upon amounts to be diverted, and the periods of diversion, as fixed by the decree in the Owyhee River Adjudication, were maximum limitations. The rights which Lodge's predecessors acquired by appropriation and diversion of water to a beneficial use were limited to the water of Cow Creek. They never used any of the water of the lake until Mr. Lodge began doing so in 1939. Mr. Lodge is entitled to use the water of Cow Creek within the limits laid down by the decree in the Owyhee River Adjudication, but only "whenever, by reason of the flow, there is sufficient water [in the stream] for such beneficial use." *City of Telluride v. Blair,* 33 Colo. 353, 80 P. 1053, 1054.

Mr. Lodge says that the court erred in finding that the growing season in the region of the lands involved is from June 1 to July 15 of each year, whereas, the Owyhee River Adjudication decree fixed the irrigation season as from April 15 to October 15. There may be a practical difference between a growing season and an irrigation season fixed by court fiat. We should judge, however, that, in general, the irrigation season will be commensurate with the growing season, but even if the lower court's finding in this connection was erroneous, it had no material effect upon the correctness of the court's decree. The irrigation season, of course, remains as fixed by the Adjudication decree.

■ The contention is made that the court erred in finding that Lodge's changed system of irrigation is detrimental to the water rights of the plaintiff. We

feel that the court was considerably handicapped in his consideration of this case by the fact that there was very little reliable evidence in respect of the amount of water in the lake available for use by plaintiff, either by gravity flow or by pumping, and in respect of the amount of water actually used beneficially and lawfully by plaintiff and defendant. No allowance whatever was made by any of the witnesses for evaporation and seepage from the lake, and, of course, the trial judge was unable to take those factors into consideration. Evaporation, at least, must be very considerable. The evidence is that when the flow of Cow Creek drops to a point where it is insufficient for the irrigation of Lodge's lands, he begins to pump water from the lake. This time varies between June 1 and June 15. From then until the end of the season he secures all of his irrigation water by pumping from the lake. Mr. Lodge testified that his pumping from the lake did not deprive the plaintiff of any water which he was entitled to use, as there was always enough water in the lake for both parties. The capacity of Mr. Lodge's pump is from $7\frac{1}{4}$ to $7\frac{1}{2}$ cubic feet per second. He claimed that his use of such pump did not reduce the level of the lake. The trial judge rejected such claim as being contrary to reason. We concur in such rejection. It is obvious that the use of Lodge's pump will result in lowering the level of the lake, down to the point at which it will cease to flow into Oliver's ditch by gravity, in a much shorter time than if no water were diverted by pumping. That, in itself, is an injury to Mr. Oliver's rights.

In any event we take the same position as was adopted by the lower court, viz., that Mr. Lodge has no right whatever to change his method of irrigation

without following the procedure laid down by the statute. We think that the evidence sufficiently demonstrated that Oliver had suffered a detriment to his rights, but, whether it did or not, we feel that he was entitled to an injunction by the very fact that Lodge had radically changed his manner, method, and period of irrigation without permission of the state engineer. § 116-606, O. C. L. A. Mr. Lodge is no doubt to be commended for his endeavors to improve his system of farming and of making full utilization of water for irrigation, but it was incumbent upon him to follow the requirements of the statute, and to show by competent evidence that his proposed improvements were not to be violative of Oliver's rights. *Farmers' High Line Canal & Reservoir Co. v. Wolff,* 23 Colo. App. 570, 131 P. 291, 294; *In re Waters of Deschutes River,* 134 Or. 623, 657, 286 P. 563, 294 P. 1049. He has sought, in this case, to thrust upon Oliver the burden of showing that Lodge's improved system of irrigation actually was a detriment to Oliver's rights, but he cannot be permitted to do this.

The trial judge was of the opinion that plaintiff had failed to establish his right to damages by a preponderance of the evidence, and therefore allowed him nothing in this regard. Plaintiff assigns this as error. Mr. Oliver testified that he irrigated 440 acres with water from Upper Cow Creek Lake. His water rights cover only 380 acres, and he appears to have been somewhat confused as to the exact area of his irrigated land. He said that up to six or seven years prior to the hearing his normal hay production was from 1500 to 1600 tons a year. For the past four or five years he harvested less than 500 tons a year, the reason for the reduction being that he didn't have the water. For the

past six or seven years he "just went slow and on what I thought I would get in the way of water. * * * The main part there I haven't been doing nothing with for just about several years. Sixty acres the first year and I would just lay off about the same amount every year." For the past three years he had not had enough water to irrigate a second crop of hay or to irrigate for fall pasture. The lake normally overflows the natural barrier for about two months, during which time he gets water by gravity flow through his ditch. Thereafter, he usually pumps for one month. Before Lodge started pumping, Oliver could get as much water as he needed, but since then he could not depend on gravity flow for even one month, and probably not for as long as three weeks. By that time the water is so low that he cannot pump, and there isn't much left in the lake. He uses his pump more to get stock water than anything else. After Lodge began pumping, the flow at the head of Oliver's ditch, where a gauge has been installed, dropped materially. He began to feel a shortage of irrigation water in the first year that Lodge pumped, which was in 1940. In 1942 Oliver began to decrease his crops. There are from 250 to 300 acres of farm land that he has not plowed for several years. He couldn't get the water so he let it go. He has been short of water every year from 1942 through 1947. In former years he didn't have to start feeding until the last part of December, but now he has to start in October or November because of lack of fall pasture. The result is that his feeding season is now about two months longer than before, which necessitates his having to have more hay in order to carry his cattle through the winter. He stated, however, that from 1940 through 1946 the level of the lake fell below

the bottom of his ditch only once, which was in 1946. When Lodge started pumping, Oliver would have to quit, as they could not pump at the same time. Lodge's pumping curtailed Oliver's crop production, and he quit putting in so much alfalfa. He couldn't get enough water in July and August. "I couldn't pump nothing. I had to turn it off because it was too low." He thought that Lodge's pumping was going to hurt him, so he didn't put in a crop. He looked at the amount of water in the lake, and knew what the moisture had been, and guessed that there would not be enough water for him by natural flow if Lodge pumped.

While it appears that Oliver failed to pump at times when there was water actually available in his sump, his testimony implies, although it does not definitely state, that he could not procure a sufficient head of water to run through his ditch. A considerable head would be necessary, as he has to run the water a distance of from five to eight miles. He has a reservoir upon his home ranch, in which he stores water which he carries through his ditch. He uses this stored water both for irrigation and for stock water. He testified that in the spring of the year it takes about four days to fill his ditch, but in the fall it takes fifteen days and sometimes longer. In those days when he raised large crops he had from six to eight men to help him, but during the last few years he didn't have to have much help, because he didn't put crops in. The last time he pumped from the lake was in 1940.

Mrs. Oliver testified that "in these last three years we have had to sell pretty short in order to be sure we had hay enough for what [stock] we didn't sell." From 1930 to 1940 they raised substantially 1500 tons of hay and grain each year. The crops declined in

quantity through the years 1941 to 1947. Mr. Oliver knew what water was in the lake, and what it could do, and left some of his land idle because he felt that if Lodge pumped water there was bound to be a shortage. The years of 1942 through 1945 were war years, and they had difficulty in obtaining help, but were able to get all the help they needed to put in crops. When they first went on the place they had from eight to twelve men, but during the war years from two to six men. In the years when they raised crops of 1500 and 1600 tons, they pumped water from the lake.

John A. Tuckness, a rancher who was familiar with the Oliver ranch, testified that it was a good ranch, with sandy soil and dense sage brush growth. In the years prior to 1930, its hay production was around four tons per acre per season—two cuttings—with some pasture crop for fall forage. Its grain crop averaged from 50 to 60 bushels per acre under normal irrigation. Mr. Oliver, he stated, was a good hard worker and a pretty good farmer, and farmed his place with average skill for that locality.

Mr. Calvin Sittzel testified that in 1945, 1946 and 1947 Oliver raised "just about enough hay to feed between 300 and 400 head of cattle." In 1947 he raised about 200 tons of hay, and sold off about 200 head of cattle, cutting his herd in two.

It appears that, while Mr. Lodge acquired his land in 1939, he did not start improving it until the following year. In 1940 he installed a pump in Cove Creek, and put a levee around the lake. The levee acted as a dam, and held back the water, and he pumped water from that for a week or two. Mr. Lodge thinks that he pumped in 1941 for a week or two at the most. In 1942 he began his present system of ditches. He pumped

water from Cove Creek in that year, and a little out of Cow Creek in the fall. Mr. Oliver testified that, in 1943, Lodge was pumping water for fall pasturage at a time when Oliver did not even have stock water. Mr. Lodge testified that in 1944 he had measurements made, and found that the bottom of his ditch was 18 inches higher than [the bottom of] Oliver's ditch. In the fall, he deepened his ditch (which was the new channel which he had excavated for Cow Creek), blew out a rocky ledge, and lowered the ditch about 18 inches, thereby putting it on a level with Oliver's ditch. In 1945 Lodge irrigated three times by pumping, and had two irrigations from the creek before starting to pump. His irrigations averaged seven days apiece. Mr. Oliver testified that in 1946 he could not irrigate by natural flow after the first run-off. There was still water in the lake, but he could not pump as he had no one to bring the pump up to the ditch and install it. He had 400 head of cattle and had to turn them out the first of March because of lack of hay. In that year Mr. Lodge irrigated three times from the creek. There was considerable testimony regarding conditions in 1947. That was the year in which Mr. Oliver claimed that he was obliged to sell half of his herd of cattle. He planted some timothy and alfalfa. He irrigated it once, and then there was no water and it died. That was the driest year since 1942. There was about a foot of water in his sump. He tried pumping and pumped down "about two feet below the bottom of the ditch." The testimony in regard to 1947 is more ample than that respecting any other year, but, for the reason that the supplemental complaint did not ask for damages for that year, the trial judge was unable to consider such testimony.

■ In our opinion the evidence sufficiently showed that Lodge's new method of irrigation caused Oliver to suffer damages. No sufficient evidence was offered, however, respecting the measure of damages. Plaintiff practically concedes the absence of such evidence as to the grain crops, and, as to the hay crops, apparently eliminates everything but the years 1945, 1946 and 1947. The year 1947, of course, must be disregarded, for lack of pleading. For 1945 and 1946, it is claimed that the evidence showed a loss of approximately 1,000 tons of hay each year. The market value of such hay at the Oliver ranch was shown to be $16 per ton, but there was no proof whatever of the expense of raising it. Counsel contend that the proof was that such expense was not more than $4 per ton, but we think they misread the testimony, which was that of Mr. Oliver himself, as follows:

"Q. Just tell me then about what you think it would cost you to raise clear up to the stacking of a ton of hay, all of the expenses included? A. I would just figure what wages I was paying and that would be what it would cost me to put up the hay. If it was two dollars, then it would be two dollars; if it was four I was paying, that—that is what it would be.

"Q. Then it has been your experience over the years, John, that it would take that much to pay for it? A. For hay, yes. Whatever you pay and the cost of irrigating and raising it."

It is apparent, we think, that Mr. Oliver was testifying about the daily wage which he was paying ranch hands, and not about what it cost him to raise a ton of hay and put it in the stack.

Moreover, there were certain features of the evidence that tended to weaken Oliver's claims for dam-

ages. For example, the question whether or not he exercised good judgment in refraining from pumping at times when there was some water available; a similar question in relation to his various reductions in his crop area; and what effect his difficulty in procuring farm help during the war years may have had in reducing his crop yield. These matters certainly did not detract from the court's difficulty in evaluating the claims for damages.

■■ Counsel request that, if the court feels that it cannot compute Oliver's damages with satisfactory accuracy, it remand the case for further and more detailed evidence on that point, as was done in *Dunn v. Henderson,* 122 Or. 331, 336, 258 P. 183. No doubt the court has discretion, in a proper case, to remand for such a purpose. Remand, in such cases, however, is usually made only when the ends of justice require it, as where, for some reason not attributable to his own neglect, a party has not had an opportunity to present his evidence upon a material feature of his case. *Smith v. Wilkins,* 31 Or. 421, 51 P. 438; *Robson v. Hamilton,* 41 Or. 239, 246, 69 P. 651; *Knapp v. Wallace,* 50 Or. 348, 357, 92 P. 1054; 5 C. J. S., Appeal and Error, p. 1304, § 1836d. It does not appear that counsel have not had ample opportunity to assemble and present their evidence. *Robson v. Hamilton,* supra. The cause has been pending since 1939. While the great delay in bringing it to a hearing may have been due, in part, to war conditions, we feel that the litigation should now come to an end. In our opinion, a remand for the taking of further evidence at this late date would be a serious abuse of discretion.

While the decree as entered herein grants plaintiff all the relief to which he is entitled, we think that

it is too broad in its terms. We approve it in principle, but, on our own motion, modify it in form by setting it aside and substituting in its stead the following:

It is ordered, adjudged, and decreed:

(1) That the rights heretofore granted and confirmed to a predecessor in interest of the defendant N. C. Lodge, by decree of the Circuit Court of the State of Oregon for Malheur County in the Matter of the Determination of the Relative Rights to the Use of the Waters of Owyhee River and its Tributaries, dated July 7, 1926, to the use of the waters of Cow Creek, Upper Cow Creek Lake, and two springs, for the irrigation of 524.9 acres of land in sections 14, 15, 22, 23, 24, 25 and 26, township 28 south, range 44 E. W. M., with date of relative priority as of the year 1872, in so far as such rights covered the use of the waters of Cow Creek and Upper Cow Creek Lake, be and they are hereby limited and confined to the use of the natural flow of Cow Creek up to but not later than the first day of July of each year, and do not include any right whatever to the use of the water of Upper Cow Creek Lake, except stock water and water for domestic purposes.

(2) That the rights heretofore granted and confirmed to plaintiff's predecessor in interest, John A. Oliver, by said decree, to the use of the waters of Cow Creek and Upper Cow Creek Lake for the irrigation of 277.1 acres of land in sections 11 and 14, township 29 south, range 44 E. W. M., with date of relative priority as of March 16, 1907, and to the use of the waters of Cow Creek and Upper Cow Creek Lake for supplemental irrigation of the above 277.1 acres of land and for irrigation of 110.9 acres of additional land in sections 2, 11 and 14, township 29 south, range 44 E. W. M., with date of relative priority as of March 7, 1923, are prior in time and superior in right to any and all rights of defendant N. C. Lodge to the use of the water of Cow

Creek for the irrigation of his above described land at any time after the first day of July in any year.

(3) That defendant, N. C. Lodge, be and he is hereby enjoined from diverting, for the irrigation of his said land, by gravity flow, pumping or otherwise, either directly from the lake or indirectly through any ditch or channel leading therefrom, or otherwise, any of the water of Upper Cow Creek Lake, and from using any water of said lake for any purpose, except stock water and water for domestic purposes.

(4) That said defendant be and he is hereby enjoined from diverting or using, at any time, any of the water of Cow Creek for the irrigation of his said land or any part thereof, by or through any artificial means other than direct diversion by dams placed in the natural channel of said stream.

(5) That plaintiff have and recover of and from defendant, N. C. Lodge, her costs and disbursements herein.

As so modified, the decree of the circuit court is affirmed, with costs.