507 P.2d 831 (1973)
Adrian L. VANDEHEY et al., Appellants,
v.
Chris L. WHEELER, State Engineer of the State of Oregon, and Clayton Gardner, Watermaster District No. 1, Respondents.
Court of Appeals of Oregon.
Argued on Rehearing December 21, 1972.
Decided March 19, 1973.
Thomas J. Moore, Hillsboro, argued the cause for appellants. With him on the briefs were Brink & Moore, Hillsboro.
John W. Osburn, Sol. Gen., Salem, argued the cause for respondents. With him on the brief was Lee Johnson, Atty. Gen., Salem.
Before SCHWAB, C.J., and LANGTRY, FOLEY, FORT and THORNTON, JJ.
FOLEY, Judge.
This is a declaratory judgment proceeding in which plaintiffs are three Washington *832 county farmers who hold permit water rights with a priority of 1949 to the waters of West Dairy Creek. They seek to enjoin the defendants State Engineer and Watermaster from enforcing what they claim to be defendants' requirement that plaintiffs repair and maintain plaintiffs' diversion works at "Dam A," hereinafter described. They also seek to enjoin defendants from denying them the right to appropriate water under their water rights pending such repair.
The principal issue centers around what is plaintiffs' point of diversion. A general diagram showing the dams and direction of flow of watercourses will be helpful.

Plaintiffs claim that the original point of diversion set by them in their application for water rights and subsequent permit has been changed by reason of the claimed fact that the natural flow of West Dairy Creek has been altered by time and circumstances so that the natural flow of West Dairy Creek is now the unnamed channel which proceeds through the plaintiffs' property and that actually plaintiffs' point of diversion is now where they pump the water our of the reservoir behind "Dam B."
Defendants contend that "Dam A" was constructed as part of a plan to divert water from West Dairy Creek for the benefit of the plaintiffs and what plaintiffs call their "natural watercourse" is, in fact, an improved diversion ditch. Defendants contend what they have required the plaintiffs to do is to install and maintain a sufficient headgate and measuring device to regulate and measure the water appropriated from West Dairy Creek at the point denominated by plaintiffs as their point of diversion in their permit for direct flow diversion of the waters of West Dairy Creek. The trial court made findings of fact and concluded that the defendants State Engineer and Watermaster's contentions were correct and found that the plaintiffs were not entitled to any relief in this proceeding. We affirm.
A brief review of law concerning the appropriation of water in Oregon will assist in understanding this controversy. In 1909 the legislature of the state of Oregon adopted a water code (now ORS ch. 537) in which it was declared that all waters within the state from all sources of water supply belong to the public and that, subject to existing rights, all waters within the state might be appropriated for beneficial use and not otherwise. The water code then provided how the waters so appropriated to beneficial use should be established as water rights by providing procedures therefor and making the office of the State Engineer the index of the rights *833 and their priorities and giving the State Engineer the authority, subject to established priorities, to cause the diversions or deliveries to be regulated so that the water would be delivered fairly to those entitled. There was thus a central index in the state where one could go to determine from records the precise water right on a given tract of land including the type of use, such as for direct flow irrigation, storage, domestic, municipal, industrial, etc., and precisely the quantity and where and how the water was to be diverted.
The water code also provided that a water user desiring to do so could apply to the State Engineer for a change in the type or character of use or change in point of diversion or place of use by an application to be processed through administrative procedures in his office (now ORS 540.520). The term "point of diversion" thus became a term of art, having the technical meaning under the water code of the place designated by a permittee in his application for water rights and ultimately in the water certificate itself.
Prior to 1949 plaintiffs had no right to appropriate water from West Dairy Creek. In that year they decided to exercise their right to appropriate water, pursuant to the water code, and each applied for and received a permit to appropriate water directly from West Dairy Creek. These appropriation permits are later in time and inferior in right to those of other appropriators of water from West Dairy Creek who are not parties to this proceeding, some of whose diversions are below plaintiffs' diversion on West Dairy Creek, and whose prior rights may be affected by a change in plaintiffs' point of diversion.[1] A change in point of diversion cannot be made if it will injuriously affect other users on the stream. Hutchinson v. Stricklin, 146 Or. 285, 299, 28 P.2d 225 (1933). Each permit which was granted to plaintiffs described the point of diversion from which water would be taken from West Dairy Creek. Vandehey's and Vanderzanden's diversion points were in Section 13, which is at "Dam A" on the diagram and the location of the present diversion works. Spiering's point of diversion was Section 18, a point which is below, or downstream, from "Dam B." In 1968 plaintiff Spiering petitioned the State Engineer for and was allowed a change in his point of diversion from Section 18 to Section 13, so that his point of diversion would coincide with that of Vandehey and Vanderzanden in Section 13. Thus, in this case, all of the relevant water rights of the plaintiffs to appropriate water from West Dairy Creek describe a point of diversion on West Dairy Creek in Section 13, which is the site of "Dam A."
In 1954 the plaintiffs made a joint application for a reservoir permit authorizing them to impound and store water for the purpose of irrigation. The permit described the source of water to be impounded as West Dairy Creek and referred to the unnamed channel as a diversion ditch. As a result of the allowance of the application there was constructed what plaintiffs call "Dam B" which allows plaintiffs to impound and store water from West Dairy Creek. Plaintiffs' point of diversion was not changed by the 1954 permit and it did not change the obligation of the defendants to see that the flow of water at plaintiffs' point of diversion in Section 13 was properly regulated. For this purpose defendants have required that the plaintiffs maintain control and measuring devices at "Dam A" in order that the defendants State Engineer and Watermaster may *834 regulate and measure the flow of water to plaintiffs. It is defendants' contention that they are merely enforcing the conditions of plaintiffs' water rights which restrict plaintiffs' rights to appropriate water to specified amounts and require regulation of the amount of water appropriated. Plaintiffs' principal contentions are that their water could be as well measured at the point where they receive it into "Dam B" and that they, in fact, have changed their point of diversion without going through the administrative process because the unnamed channel has become a natural stream and therefore their diversion really is at the point where the natural stream enters their impoundment.[2]
ORS 540.310 requires that a control or measuring device be installed at the point where the water is diverted. The construction of "Dam A" apparently was the result of compliance with this statute.[3] (Plaintiff Vanderzanden was a party to the construction of "Dam A" but who built the dam or who owns the land on which it is constructed is not relevant to this proceeding.) It is the responsibility of one who applies for and obtains a water right to see that a proper control mechanism and measuring device is provided. "Dam A" was the control and regulating works when the State Engineer made his survey in 1958. Whether the unnamed channel became a natural stream also is immaterial to this case.[4] The plaintiffs' point of diversion for the waters of West Dairy Creek is the location set forth in their respective water certificates and the unnamed channel is merely a conduit used to convey the water to plaintiffs' places of use. The use of a natural stream as a conduit for diverted water is not uncommon under Oregon water law. See In re Waters of Deschutes River, 134 Or. 623, 286 P. 563, 294 P. 1049 (1930), appeal dismissed 290 U.S. 590, 54 S.Ct. 83,78 L.Ed. 520 (1933).
As mentioned above, an administrative procedure is provided by statute for the owner of a water right to change his point of diversion, ORS 540.520, by filing an application to do so with the State Engineer.[5] *835 The statute further provides that notice of the proposed change be published in a newspaper in the county where the rights are located so that others affected by such change may appear at a hearing to be held thereon and that the State Engineer will then proceed to make a determination as to whether or not the change can be effected without injury to existing rights. If the plaintiffs had followed this procedure in this case, other affected water right holders would have had an opportunity to object to a change in point of diversion if it adversely affected the enjoyment of their water rights. That plaintiffs were aware of this procedure is shown by plaintiff Spiering's compliance with the procedure in making his change in point of diversion in 1968.[6]
In summary, this is a declaratory judgment proceeding in which the plaintiffs seek to have the court change their point of diversion from that specified in their permits without going through the statutory procedure for change in point of diversion and, consequently, without notice to other water users who may be prior in time and right to the plaintiffs. For the reasons herein set forth, we agree with the trial court that the plaintiffs are not entitled to the relief requested.
Former opinion withdrawn.
SCHWAB, C.J., dissented and filed opinion.
SCHWAB, Chief Judge (dissenting).
I would adhere to our former opinion in this case. Vandehey v. Wheeler, Or. App., 95 Adv.Sh. 403, 499 P.2d 1319 (1972).
Specifically, I disagree with the majority in the following particulars.
Plaintiffs do not seek "to have the court change their point of diversion," as the majority asserts. The Watermaster directed plaintiffs to repair or replace what the majority calls Dam A at plaintiffs' expense. The Watermaster stated he would terminate plaintiffs' rights to appropriate water if they did not do so. As the prayer for relief in plaintiffs' complaint makes clear, they seek a declaration that they do not have to comply with the Watermaster's demands, and an injunction against the Watermaster's following through on his stated intentions.
This presents the question of interpreting and applying ORS 540.310(1), which provides:
"The owner of any ditch or canal shall maintain to the satisfaction of the State Engineer a substantial headgate at the point where the water is diverted. It shall be of such construction that it can be locked and kept closed by the watermaster."
This statute would require plaintiffs to repair or replace Dam A if it is "at the point where the water is diverted."[1]
The majority concludes that for purposes of applying ORS 540.310(1), plaintiffs' *836 water is diverted at "the place designated by a permittee in his application * * * and ultimately in the water [right] certificate itself."[2] I would define "the point where * * * water is diverted" as that point at which the natural flow of water is, in fact, physically diverted by some act of man. This definition is at least implicit in the water code[3] and in prior Oregon cases.[4] I find nothing in the water code that supports the majority's definition.[5]
The majority states that whether the unnamed channel is a natural watercourse or a "ditch or canal," within the meaning of ORS 540.310(1), is "immaterial." That is the most material issue in applying ORS 540.310(1) and what I believe to be the proper definition of diversion point to the facts at bar. All parties have treated that issue as material from the filing of pleadings through the filing of petitions for rehearing. In fact, most of the evidence at trial went to that issue.
The record clearly establishes in my mind that the unnamed channel is now a natural watercourse, and probably was such in 1949; the majority apparently does not conclude to the contrary. Thus, it is legally impossible for plaintiffs' diversion point to be at the place stated in their water right certificates. No act of man diverts any water into the unnamed channel at the fork of West Dairy Creek and the unnamed channel. No act of man diverts any water toward plaintiffs at Dam A. The only thing Dam A does is divert water that would otherwise naturally flow down the unnamed channel back into the original channel of West Dairy Creek. Plaintiffs' diversion point is where they, in fact, physically divert water from the natural flow, i.e., at Dam B. Therefore, ORS 540.310(1) does not authorize the Watermaster to require plaintiffs to repair or replace Dam A.
Such a holding would, incidentally, result in a change in plaintiffs' diversion point. However, I fail to see how this could possible prejudice any of plaintiffs' neighbors. Respective water rights depend upon extent of appropriation authorized and priority date. A change in diversion point, made incidentally to granting other judicial relief, could not possibly affect those material ingredients of water rights.[6]
ORS 540.310(1) and other provisions of the water code require persons appropriating water to construct devices that enable the Watermaster to measure and regulate the amount of water they appropriate. These plaintiffs have offered to construct control and regulation devices that fully comply with this requirement.[7] Instead, the Watermaster insists that Dam A be repaired *837 or replaced. His testimony makes it clear to me that he is making this demand in an effort to force the water that flows naturally into the unnamed channel back into the original channel of West Dairy Creek, not because of any real desire to measure or regulate, at Dam A, the amount of water plaintiffs are appropriating. In my opinion, plaintiffs are entitled to a judicial determination that ORS 540.310(1) does not require them to alter a natural flow of water, even though this may incidentally result in a change in their diversion point.[8]
For the foregoing reasons, in addition to those stated in our former opinion, I dissent.
NOTES
[1] Plaintiff Vanderzanden was aware of the superior rights of the lower users on West Dairy Creek even before the construction of "Dam A." At plaintiffs' present point of diversion he dug a trench to divert the water from West Dairy Creek into the unnamed channel in 1953. Upon remonstrance by the owner of a higher priority water right on West Dairy Creek just below plaintiffs' present point of diversion, plaintiff Vanderzanden sandbagged the channel he had dug. It was this channel which plaintiff Vanderzanden dug and the rest of the unnamed watercourse, which plaintiffs now claim to be a natural watercourse.
[2] If plaintiffs' contention is correct the result would be not only to change their point of diversion, but also to change the source of the irrigation water. The source is designated in the water certificates as being from West Dairy Creek. Not until events leading to this suit have plaintiffs maintained that their source was anywhere but West Dairy Creek. If plaintiffs were to apply for a new source they would have to make new applications for water rights and would lose their present priority. There is no statutory provision for a transfer of the source. If such an application were made, then the State Engineer for the first time in this matter would have before him the question of whether the unnamed channel was a natural stream and he could make his investigation and compile the necessary data accordingly.
[3] The State Engineer in this situation is not authorized to require the building of a dam, as such, but only to require construction and maintenance of a headgate and measuring devices so that he can measure and control the amount of water which the permittee is actually diverting from the stream. A dam might be the logical means to be employed by the appropriator but whatever means the appropriator might employ to restrain the flow of water so that it would be delivered through a headgate with a proper measuring device installed would comply with the statute.
[4] The trial court found that the unnamed channel had not become the natural channel. The court said:

"The plaintiffs contend that the unnamed channel has become the natural channel and that their rights are at the point of their dam at the site of the reservoir.
"This contention is not well taken. The rights of plaintiffs originate at the diversion point, i.e., at or near the West Dairy Creek. A headgate and measuring device at this point will determine the amount of water being diverted to the unnamed channel and into the reservoir. It will also insure that users downstream with prior rights will not be jeopardized."
[5] Oliver v. Skinner and Lodge, 190 Or. 423, 436, 442, 226 P.2d 507 (1951), recognizes the procedure. It holds that the scope of the first appropriation is the measure of the right. If there are problems about the rights involved in a change in point of diversion "* * * [they] should properly have been submitted to the state engineer in support of an application for permission to change the point of diversion * * *."
[6] Oregon's procedure is not unique in requiring an appropriator to secure the approval of an administrative body before changing the point of diversion.

"It is often provided by statute that an appropriator wishing to make a change in his point of diversion * * * shall first make application or petition to, and obtain the approval or permit of, a designated officer or tribunal. Such statutes have been enacted for the purpose of avoiding confusion and perfecting or preserving the record of water rights, and to put a stop to a multiplicity of actions because of such changes. * * *" 93 C.J.S. Waters § 189, p. 977.
[1] Only a dam that would completely block the unnamed channel would be a "headgate * * * of such construction that it can be * * * kept closed by the watermaster" within the meaning of ORS 540.310(1). But see n. 3 of the majority opinion.
[2] If the majority is suggesting that a permittee "designates" any of the contents of a water right certificate, I disagree. Water right certificates are prepared and issued by the State Engineer. See, ORS 537.250(1).
[3] ORS 540.310(1) requires construction of a headgate where water is diverted into an irrigation ditch or canal, i.e., where the natural flow is diverted into a manmade channel.
[4] See, e.g., Hutchinson v. Stricklin, 146 Or. 285, 297, 28 P.2d 225 (1933):

"To the valid appropriation of water three elements must exist: (1) Intent manifested to appropriate to some beneficial use existing at the time or contemplated in the future; (2) a diversion from the natural channel by means of a ditch, canal or other structure; (3) the application of it within a reasonable time to some useful industry * * *." (Emphasis supplied.)
[5] In some circumstances, water right certificates are conclusive as to priority and extent of appropriation. See, ORS 537.270; Cleaver v. Judd, 238 Or. 266, 393 P.2d 193 (1964). The water code gives no such conclusive effect to a diversion point designation.
[6] The majority emphasizes what they consider to be the importance of the designation of plaintiffs' diversion point in the public records on file with the State Engineer. Anyone consulting those records would learn that plaintiffs' diversion point is located "in the SW 1/4 NE 1/4, Section 13, Township 1 North, Range 4 West, W.M." I doubt that this information is sufficiently precise to ever be very useful to plaintiffs' neighbors.
[7] ORS 540.340(1) provides:

"Whenever it may be necessary for the protection of other water users, the State Engineer shall require every owner or manager of a reservoir or diversion dam, located across or upon the bed of a natural stream, to construct and maintain a suitable outlet in the reservoir or diversion dam which will allow the free passage of the natural flow of the stream. The State Engineer shall determine what constitutes a suitable outlet."
Apparently with this statute in mind, plaintiffs' complaint alleges:
"* * * [P]laintiffs are agreeable to installing a measuring device on said stream [the unnamed channel] above their reservoir [i.e., above Dam B] and a measuring device below their reservoir to assist the Watermaster in determining the amount of water to which plaintiffs are entitled and are appropriating * * *."
[8] Plaintiffs should not be denied relief on the grounds that they did not exhaust the administrative remedy supposedly available to change their point of diversion. I find nothing in the pleadings or record that raises any question of exhaustion of remedies. Moreover, it is not clear to me that ORS 540.520 creates an administrative remedy that is applicable to this situation, i.e., where the plaintiffs claim, in effect, that their diversion point was never actually at the place stated in their water right certificates.