Argued at Pendleton October 31; reversed November 28, 1939;
rehearing denied February 14, 1940

# STATE ex rel. JOHNSON *v.* STEWART
## (96 P. (2d) 220)

In Banc.

*Robert M. Duncan*, of Burns, for appellant.
*C. B. McConnell*, of Burns, for respondent.

BEAN, J. This is a proceeding in contempt for disobedience of a decree entered in the circuit court of the state of Oregon for Malheur county on the 13th day of May, 1925, "In the Matter of the Determination of the Relative Rights to the Use of the Waters of Malheur River and its tributaries (except Willow creek and Cottonwood creek), a tributary of Snake River."

Crane creek rises near the north line of T. 24 S. R. 34 E. W. M. and runs almost due south into the next township where it enters the north line of defendant's property at the north line of section 2 T. 25 S. R. 34 E. W. M., and runs thence south through section 11. At the south line of section 11 it enters the N½ of the NW¼ of section 14, the property of Mrs. Ira B. Clark, then swings west meandering through the NE¼ of section 18, on Oregon-Western Colonization Company property, entering the Johnson property near the NW corner of the SW¼ of section 14, more than a half mile below the Stewart property.

The water rights on Crane creek were adjudicated in the general adjudication of the waters of Malheur river and its tributaries, decree being entered May 13, 1925, after years of litigation. So far as pertinent to this case the decree of adjudication, as the record shows, is substantially as follows:

| Ownership when adjudicated | Present Ownership | Acreage | Priority |
|---|---|---|---|
| C. T. Carey ............... Paul Stewart ...... | | 35.5 | 1884 |
| Geo. W., Nancy E. and Ira B. Clark ..... Lloyd L. Johnson | | 21.5 | 1885 |
| C. T. Carey ............... Paul Stewart ...... | | 62.5 | 1887 |
| Thos. R. Clark ........... Lloyd L. Johnson | | 23.5 | 1887 |
| C. T. Carey ............... Paul Stewart ...... | | 12.5 | 1908 |

The stream has a low watershed. The spring breakup brings a large head, gradually decreasing to the vanishing point by late July.

The affidavit of contempt charges that defendant, disregarding the provisions of said decree of adjudication which are set out, knowingly, wilfully and unlawfully:

"(1) In 1936 constructed two solid rock and earth dams across the channel of Crane Creek which were thereafter maintained during the irrigation season depriving relator of irrigation and stock water.

"(2) In 1937 constructed a third solid dam across Crane Creek with similar effect.

"(3) In 1937 'planted' beaver on his property which put obstructions across channel which defendant refuses to remove. Charges such dams at times overflowed banks of the stream and diverted water upon lands not given a water right by decree, and has caused waste and seepage through seepage and percolation and caused evaporation to relator's damage.

"(4) During 1938 each of above obstructions were maintained. That in 1938 defendant diverted and used 151 acre feet of water as against a right to use 106.5 acre feet.

"(5) Alleges damages:
    (a) Pumping stock water 1936, 1937, 1938 at $100 a year .................................. $300.00
    (b) Loss of crops 1938 ........................... 200.00
    (c) Attorney's fees ............................... 150.00"

Defendant answered and admitted all portions of the Malheur decree as set out in the information, described the stream in general terms, denied any violation or contempt, and alleged that in its natural condition Crane creek was the natural habitat for beavers; that the stream had many beaver dams which were the natural agencies that prevented excessive erosion of the soil and built up the low lands now irrigated; that shortly after 1924 by means unknown all beavers were removed from the stream; that during the ensuing eight years, with no beavers in the stream, their dams were washed out and an excessive erosion took place deepening the channel many feet and for long distances through the Stewart property; that about 1934 beavers returned to the stream through natural means and began the restoration of their dams; that in 1937 the State Game Commission, with the consent of defendant, placed in said stream 16 additional beavers, which spread out over some six miles of said stream and started to build dams on the property of Rebecca Carey, above defendant, and Mrs. Ira Clark, below defendant, as well as on defendant's property; that the major portion of such work was performed in the fall of 1937 and spring of 1938; that defendant, more than 10 years before, with the consent and approval of the then watermaster, started the construction of two rock dams in the channel of Crane creek for the purpose of erosion control, that were not designed for or intended to be used as diversion dams and could not raise water within four feet of the surface of the land; that prior thereto the erosion of said stream had deepened the channel to a depth of 16 to 20 feet in places, causing the banks to slough off to an extent to cause serious damage to the property and serious inconvenience in cross-

ing the stream bed with livestock, farm machinery and equipment, thereby preventing the full and proper use of land east of the stream; that in one year the beavers had done more to check erosion than defendant had been able to do in 14 years by the expenditure of large sums of money; that a third rock dam to control erosion was started in 1937, but was washed out in the spring of 1938 and did not serve its purpose; that all of said dams, rock and beaver, have resulted in the conservation of water in said stream and have been beneficial to defendant and relator and other water users, and as such work progresses will further improve the conditions of stream and further extend and lengthen the irrigation season; that defendant has at all times used water under the instructions and advice of the watermaster and has never at any time or on any occasion interfered with the regulation of his dams or ditches by any watermaster, and denies that relator has been deprived of any water to which he was lawfully entitled or had been damaged in any manner whatsoever; that the present watermaster had threatened to remove the beavers and erosion dams and defendant had refused him permission so to do and alleged that defendant would take all lawful means to prevent such removal; that on numerous occasions during the summer months the entire flow of said stream had been permitted to flow down the channel for periods of seven to ten days each in an effort to get water to relator but that such natural flow would not reach relator and such water was lost.

To these allegations relator entered a general denial and issues were so joined. The affidavit of contempt raises two separate elements of contempt, as follows:

(1) That defendant diverted and used in irrigation 151 acre feet during 1938, being 44.5 acre feet in excess of the amount defendant was entitled to under his 1884 priority, and that a "considerable amount" was applied on lands with an 1887 priority.

(2) That the construction of the rock dams, the permitted "planting" of beavers, with the construction of dams across the channel together with the refusal of defendant to remove, or to permit their removal by the watermaster constituted wilful contempt.

The Stewart property is one and one-half miles from north to south. The diversion dam for the Carey ditch, serving the property of Stewart, is located just within the north fence, on a shallow bar where no extensive dam for diversion is required. The ditch is on the west side of the stream, follows the hillside, and is slightly less than two miles in length. All the 1884 and 1887 water rights are on the west side of the stream and under this ditch. The Stewart home, barn and garden are at the end of this ditch, on the south line of his property. The ditch served the garden and provided water in the barn lot for livestock. There are three rock dams complained of. The first is approximately 200 feet above the south line; the second is approximately in the center of the field; the third, constructed in the fall and winter of 1937, is a little over one-fourth of a mile above the second. The beaver dams complained of are near the center of the Stewart field. The testimony is uncontradicted that in addition there are beaver dams above the Stewart diversion into the Carey ditch and also in the channel below the Stewart property on Mrs. Ira Clark's land.

The record shows that neither the rock dams nor the beaver dams diverted any water over the surface of the land.

The case was tried before the court without a jury. The court adjudged defendant guilty of contempt for disobedience of the decree and that defendant be punished for said contempt by a fine of $300, and rendered judgment for $500 damages. Defendant appeals from such judgment.

Defendant contends that the affidavit of contempt does not state facts sufficient to constitute a cause of contempt; that the court is without jurisdiction to enter the judgment appealed from; that the evidence does not support the findings of fact, conclusions of law or judgment; that the court erred in entering any judgment for damages as a matter of law; that the relator failed to prove any allegation or element of damages.

The charging part of the affidavit alleges in substance:

"That disregarding the provisions of said decree, and the rights of plaintiff * * * thereunder, the defendant * * * in direct disobedience of said lawful decree * * * is thereby in contempt and is liable * * * in damages in the following particulars:

"First: That in 1936 said defendant constructed two solid rock dams across the channel * * * and did thereby hold up, divert and use more water * * * than he was entitled to under said decree, and did thereby prevent water flowing down to and upon lands of plaintiff to which he was lawfully entitled.

"Second. That in 1937 defendant constructed a third solid rock dam across the channel * * * and by use of said dam and the two dams so constructed in 1936 * * * deprived plaintiff of the use of water to which he was entitled * * *.

"Third. That in addition to the three dams * * * defendant * * * procured a number of beaver * * * and 'planted' them in the channel of said stream on his premises in 1937 and a number of dams have been built across and in said channel by said beaver, and all of which illegal obstructions the defendant has refused to remove * * * and that by reason of the holding up of the waters * * * by said dams * * * water has been diverted at various times and places * * * upon lands not entitled to the use of water * * * all to the great and continuing loss and irreparable damage of the plaintiff.

"Fourth: That during the irrigation season of 1938 all of said obstructions have been maintained and continued and have held up and prevented water reaching the lands of plaintiff to which he was entitled under said decree; that in direct disobedience of the instructions of the watermaster of said district the defendant during the irrigation season of 1938 diverted and applied to his lands approximately 151 acre feet of water from said stream, same being in excess of approximately 44.5 acre feet over the amount of water to which he was entitled under the decree for use upon his lands having the 1884 date of priority of use, a considerable amount of which was applied to and used upon land with an 1887 priority of use, and during said season there was available for use of plaintiff upon his lands with date of priority of 1885, approximately 34.5 acre feet, and by reason thereof plaintiff's crop yield has been greatly reduced, and he has had no water upon his lands since about July 25th, 1938, although there has been an ample supply of water in the flow of said stream to complete the irrigation of the lands under the 1885 priority and to furnish water for his livestock at all times during the season, and that by reason of such shortage the plaintiff has been compelled to pump water for his cattle."

In regard to the years 1936 and 1937, neither the affidavit nor the testimony shows what the flow of

the stream was, nor whether there was any water in the stream during the irrigation season, how much water he obtained for irrigation, whether his rights had been exhausted, nor any specification of damage that the law recognizes. There is no testimony in regard to the measurement in the stream until 1938.

Clarence Young, watermaster of the district, testified as a witness for plaintiff in regard to that season. A resume of his testimony appears in appellant's brief, as follows:

"All dates 1938.

May 12 67 in.—Measured defendant's diversion, found 1.68 second feet, 67 inches, used on land with '87 priority. (No testimony as to water on Johnson place.)

May 13 35 in.—Regulated Carey ditch, cut to 35 inches, water on land of '87 priority, instructed Stewart to use on '84 lands. Did not examine Johnson lands at that time. Regulated to conform to decree.

May 17 35 in.—Same as regulated before, 35 inches, used on '84 priority. Some 25 or 30 inches going past diversion intake, didn't measure. Didn't see Johnson lands.

May 24 49 in.—Entire creek in Carey ditch, 49 inches, used on '84 lands. Didn't see Johnson lands, didn't change water.

May 27 41 in.—Entire flow in Carey ditch, 41 inches. O-W Col. lands 8 inches (between parties) 9 inches return flow ¼ mile above Johnson. Didn't see Johnson lands. Made no change in ditch. At that time I went over the diversion of the Clark, and Colonization, Johnson land and there was 17 inches in all the diversions there at that time.

June 1 37 in.—Stewart 37 inches. All of Creek. On '87 Rye. 12 inches 300 yards below Stewart could have gone to Johnson. Made no change at Stewart intake. 12 inches 300 yards below Stewart. Some water going to Johnson, didn't measure.

June 6 34 in.—Measured Stewart water at intake by weir 34 inches, by current meter 36 inches. All in Stewart ditch on '84 lands. Made no change. 7 inches below Stewart place. Didn't see Johnson place.

June 13 29 in.—Found all water in Stewart ditch, 29 inches, on '84 lands. Made no change. 8 inches 300 yards below Stewart. Johnson getting a little.

June 18 34 in.—All water in Stewart ditch, 34 inches. Made no change. 12 inches below Stewart. Didn't see Johnson diversion.

June 23 50 in.—Found 50 inches to Stewart on '84 lands. 26 inches below Stewart place. Johnson getting 20 inches or more. Increase due to rain. Made no changes.

June 30 32 in.—Found 32 inches in Stewart ditch on '84 lands. Made no change. 300 yards below Stewart 15 inches. (No comment on Johnson diversion).

July 7 25 in.—Stewart 25 or 26 inches. Made no changes. Found 10 inches 300 yards below Stewart.

July 18 28 in.—Stewart 28 inches on '84 lands. No water to Johnson. Made no change.

July 25 24 in.—Stewart 24 inches on '84 lands. Computed totals, found 132.7 acre feet delivered, allowance 106.5 acre feet. Oversupply 26.2 acre feet. Closed ditch. Turned all water down stream. 5 inches 300 yards below Stewart. None to Johnson. * * *

July 30—Went over Creek. No water to Johnson after five days. Counted six beaver dams. Water 3 or 4 feet deep. Talked with defendant. Asked him to tear out beaver dams. Stewart refused. Young then said he would put water back in Stewart ditch. Said Stewart promised to use in his garden and then turn to the Creek. Young put water back in Stewart ditch himself. (Note: Young testified his instructions from the State Engineer were that where flow did not reach lower appropriator within five days an economical waste resulted and to return it to upper appropriators who could use it.)

Aug. 11 16 in.—Found 16 inches at Stewart weir used on grain on '84 lands. Made no change in water.

'There was a little water flowing in the creek below the Stewart place reaching about 400 yards on the Johnson land.'

Aug. 19 18 in.—Stewart 18 inches on '84 grain. 'The water was reaching then about 100 yards of Johnson's land.' (He later stated Johnson was getting no water at this date, presumably for irrigation). Made no change in diversion.

Aug. 23 24 in.—Stewart 24 inches on alfalfa and garden. No water to Johnson. Carey ditch had received 161.80 acre feet. Made no changes.

Oct. 22—Deputy Kenneth Young found 5/16 inch going over Stewart weir. Did not go to Johnson's or below Stewart place. Made no changes.

Defendant had been told by former watermasters, who were competent engineers, that the entire flow of Crane creek during the irrigation season would not fill his 1884 water right and he relied upon and had faith in these statements. They had not regulated the stream for this reason. He therefore questioned the accuracy of the statement of Mr. Young, who had not yet earned a reputation for accuracy or expertness in this technical field.

The testimony is unquestioned that neither defendant nor his employees at any time or in any manner interfered with the regulation of the water by Mr. Young, the watermaster.

Plaintiff Johnson testified that "as a rule the water ceases about the first of June, always."

Paul Stewart, the defendant, testified, in explanation of the use of the water on the garden when it was turned down by the watermaster and then released to go back into the river, in substance, that when it went past his place "there is a little ditch goes along the line fence and drops in where the old Clark dam used to

take out of the creek,'' and the water went down the line fence and went out on the sagebrush land. He had plowed a little ditch once there simply for drainage. He stated:

''There was so little of it by the time it reached—I imagine—that high line ditch would be a mile and a half long, and at that time of year it didn't make any difference how much there was up above, by the time it reached there there would be a little trickle at the house, there wasn't volume enough of water to get there, that was all. On the other hand if the creek had been raised up to somewheres near the level of the ground, this water would have gone down and hit that stream and gone back into the creek.''

Mr. H. D. Willis, an engineer of 34 years' experience, testified that he examined Crane creek and the beaver dams mentioned, and that there were no dams diverting water over the surface. Further, he testified:

''Q. From your examination of this particular stream, in your judgment will the construction of beaver dams that do not divert water over the surface of the soil lessen or decrease the amount of water that will flow to lower appropriators?

\* \* \* \* \*

A. Only during the time that they are filling up, the short time they are filling up behind the dam, from then on it should increase it in time.

Q. When do they fill up, what season?

A. Any time the beaver builds it, usually, if the dam is built early in the spring it will fill right up. After they once fill there will be some seepage, but that will as a rule return to the creek below.

Q. Where does that seepage take place—immediately adjacent to the beaver dam?

A. It takes place back as far as the pond stands.

Q. What is the effect of the construction of a beaver dam as to the storage of water, what happens?

A. Well, you get storage, that depends on the amount of pond behind it, and you will get an underground storage depending on the character of the soil.

Q. And if it is a loose, porous soil, that storage extends on both sides of the stream?

A. Extends on both sides, but of course it will come out below if it is a loose soil, it will come out below the dam.

Q. That water which is stored in the soil and subs out from the dam, is that subject to any loss?

A. Oh, there is more or less loss. * * * There is some loss by percolation, it don't all come out, but most of it does, depending on the character of the soil.

Q. Assuming, Mr. Willis, that a series of beaver dams may be built through the Stewart property sufficient in number to prevent the erosion or check the erosion that is going on without diverting water over the surface of the soil, what would be the effect on the water below, the flow below the Stewart property?

A. It should increase it.

Q. How much should it increase it—materially, or just slightly?

A. In time it will increase it materially.

Q. What would be an ideal situation on a stream of that nature, to have these checks from place to place?

A. An ideal situation would be if they had a series of beaver dams all the way down it, clear on through.

Q. And on the Johnson property?

A. Yes, way on through.''

John Scharff, a witness for defendant, was a civil engineer with 12 years' experience. For about three years he was in charge of an erosion experiment in the Fremont National Forest, involving a stream very similar to Crane creek, where there were water appropriations on the creek. He gives his experience on a certain stream and states that they put in beaver dams for two miles and it did not decrease the flow of water. We quote from a portion of his testimony:

"Q. From your examination of this stream can you state whether or not the obstructions placed in the stream by beaver through the Stewart place have diminished the flow of water to points below or not?

A. Well, I am of the opinion that they would have the effect of extending the length of flow in the creek below—I mean over a longer period of time in the season.

Q. When these obstructions are placed in a deep channel by the method you have described, what is the effect of such obstructions, what effect does it have upon the water in the surrounding soils?

A. That is, the beaver obstructions?

Q. Yes, beaver or any other obstructions?

A. Well, it depends of course on the type of soil, but regardless of the type, it has the effect of spreading the water out and creating an underground storage. Some soils will create, of course, a larger storage than others.

         \*       \*       \*       \*       \*

Q. And that return flow to the stream would then go on down to the lower appropriators, would it not?

A. Sure.

         \*       \*       \*       \*       \*

Q. Now Mr. Scharff, assuming a condition on Crane Creek whereby we had a series of beaver dams from the Lloyd Johnson place clear above the Stewart place, stepping that water down and keeping the water, say within three feet of the surface of the surrounding country, would or would not that be beneficial to the Johnson property in the ordinary course of irrigation?

A. I am sure that it would be, not only beneficial to Mr. Johnson but the users if any, below him."

It should be noticed that the irrigated lands of the defendant Stewart are situated on Crane creek and that he has a priority right of 1884 which is senior to the right of the plaintiff Johnson, and that Johnson's lands are located on the stream about two miles below

Stewart's with a priority right of 1885, which is a junior right to Stewart's.

Defendant contends that the affidavit of contempt does not state facts sufficient to constitute a cause of contempt, and that, even though the affidavit stated facts showing a violation of the decree by one not a claimant or party to the original proceeding, there is no remedy.

■ The decree of the circuit court of May 13, 1925, adjudicated the rights of C. T. Carey in relation to the land described. The decree was conclusive as to the rights of C. T. Carey, as adjudicated therein, and bound Paul Stewart, Carey's successor in interest. *Squaw Creek Irri. Dist. v. Mamero, et al.*, 107 Or. 291, 297, 214 P. 889; *In re Waters of Chewaucan River*, 89 Or. 659, 687, 171 P. 402, 175 P. 421; *Abel v. Mack*, 131 Or. 586, 283 P. 8.

■ The circuit court ordered and adjudged that defendant cause the State Game Commission of Oregon to move the beavers from the channel of Crane creek within his premises. In this respect the circuit court exceeded its jurisdiction. It does not have jurisdiction over the State Game Commission of Oregon and cannot adjudge that defendant cause the State Game Commission to remove the beavers. The State Game Commission is not before the court. Defendant is powerless to control their action, either to remove the beavers or issue a permit for their destruction.

■ There is an item in regard to the judgment that should be mentioned here. The court awarded plaintiff judgment, among other things, for $100 for pumping water in the year 1938. The plaintiff himself testified that he did not pump water for stock during 1938. It was error to include that amount in the judgment.

Disobedience of any lawful judgment, decree, order or proclamation of the court is a contempt. § 8-501, subd. 5, Oregon Code 1930.

■ Proceedings for the punishment of those accused of the violation of a decree or order of court are quasi criminal, and statutory provisions relating thereto must be strictly complied with. *State ex rel. v. Mount,* 139 Or. 694, 700, 10 P. (2d) 606, and cases there cited.

■ It is well settled that a defendant must be clearly shown to be in contempt before the court will entertain an application which seeks to punish him. Rapalje on Contempts, 111, § 86. We read in 13 C. J., 66, § 89, as follows:

"Since no intendments or presumptions are indulged in aid of the complaint in contempt proceedings because of their criminal nature it has been held that, where the contempt consists in doing a forbidden act, the affidavit is fatally defective unless it alleges an unlawful intent. But if, in the nature of the case, the intent is a part of the acts charged it need not be separately alleged."

The only facts stated in the affidavit of contempt for the years 1936 and 1937 relate to the construction of the dams. For these years the water was not measured and it is not shown whether plaintiff knew whether defendant deprived him of any water or not.

The statute provides that there shall be appointed by the state engineer one watermaster for each water district. § 47-309, Oregon Code 1930. Section 47-310 provides:

"It shall be the duty of [each of] the said water masters to divide the water of the natural streams or other sources of supply of his district among the several ditches and reservoirs, taking water therefrom, according to the rights of each, respectively, in whole or in

part, and to shut and fasten, or cause to be shut and fastened, the headgates of ditches, and shall regulate or cause to be regulated, the controlling works of reservoirs, in time of scarcity of water, as may be necessary by reason of the rights existing from said streams of his district. The water master shall have authority to regulate the distribution of water among the various users under any partnership ditch or reservoir, where rights have been determined, in accordance with existing decrees. Whenever, in the pursuance of his duties, the water master regulates a headgate to a ditch or the controlling works of reservoirs, it shall be his duty to attach to such headgate or controlling works a written notice properly dated and signed, setting forth the facts that such headgate or controlling works has been properly regulated and is wholly under his control, and such notice shall be legal notice to all the parties interested in the division and distribution of the water of such ditch or reservoir."

The testimony of defendant and that of Mr. Young, the watermaster, indicates that defendant Stewart used the water in accordance with the directions of the watermaster, except that there is some dispute in regard to the quantity of water used by defendant, as the defendant believed, on account of the directions of the former watermaster, that Mr. Young made a mistake in regard to the measurements. Defendant testified that several times during 1938 he permitted all of the water to run down the creek for a week or ten days and that it did not reach Johnson's land. We are not aware that this testimony is contradicted. It appears that defendant received 132.7 acre feet of water, which is claimed to be 26.2 acre feet more than he was entitled to, before the watermaster closed the ditch on July 25, 1938, and that this was not in any way used contrary to the directions

of the watermaster, and, as we understand, was in accordance with his directions.

We quote from the opinion in the case of *State ex rel. Zosel v. District Court*, 56 Mont. 587, 185 P. 1112:

"When an appropriation is made of the waters of a stream, the rights of the appropriator are limited to the natural condition of the stream at the time the appropriation is made, and are not enlarged by subsequent improvements made by another which increase the supply flowing in the stream, * * *." See also 3 Farnham on Waters and Water Rights, 2087, § 672d.

Unquestionably the condition of Crane creek has been changed since the appropriations of water were made.

The question of using the water by an upper or junior proprietor, when there is not sufficient water to reach the lower user, is explained in the opinion of *Raymond v. Wimsette*, 12 Mont. 551, 31 P. 537, 33 Am. St. Rep. 604, as follows:

"One of the primary facts upon which the water right is founded, and without which it cannot exist, is the power of the appropriator to utilize the water which he claims for some lawful and beneficial purpose. Would it not therefore be unreasonable, and contrary to the theory of the law governing the subject under consideration, to hold that although experience of many years, and actual demonstration, confirm the proposition that none of the water in controversy could, if left in the stream, reach plaintiff's place of diversion, at a distant point below, still defendant should be restrained from the use thereof on the ground of plaintiff's prior claim to the water of said stream, at the place of his diversion? In our judgment, such holding would be entirely contrary to the spirit, if not the letter, of the law; and there is not even, in the letter of the law, anything tending to such a doctrine."

The construction of the rock dams and the defendant's allowing beavers to construct dams in the creek to control erosion raises an important question. We find no precedent and none has been cited in our aid, and we think it is res novae.

Let us suppose that Stewart and Johnson had been using water that was conducted in a wooden canal or flume and by means of high water, or in some manner, the flume had been broken and injured. Without question it would be proper for either of the parties to repair the flume and restore it to its original condition.

Crane creek during high water has been eroded so that the channel was four to sixteen feet deeper than it originally was and the defendant constructed dams and permitted beavers to construct dams to control the erosion. Plaintiff claims that these dams prevent the water from flowing down to his land, but the testimony indicates the main trouble was that the water was low in the stream and that the dams would not prevent the water from flowing to plaintiff, except to a small extent. These dams, however, do create a slight storage of open water in the channel, estimated by the watermaster to be, "Oh, possibly an acre and a half or two acre feet." This storage occurs during the high water in the first part of the season and affects the amount of water going to Johnson's land to only a slight extent, if at all. It is really a question for experienced and qualified engineers to determine and their testimony indicates that such dams would not be a hindrance to irrigation but would be a benefit and that eventually more water would be carried to the lower appropriator Johnson on account of the dams.

After giving the matter our best consideration, we think that defendant would have the right to construct

dams or permit them to be constructed by beavers to control the erosion, without diverting the water over the land or from the diversion works of another appropriator, and restore the bed of the stream to its original condition as near as may be, if he can do so without materially interfering with the right of the lower appropriator Johnson.

This is a question that depends largely upon the facts and we do not presume to determine it as a matter of law.

■ To deny our water users the right to control such streams and prevent the erosion that would soon take place would mean the utter destruction of much of our most valuable irrigated lands throughout the state. It is the duty of the landowner to prevent the construction of dams to a point where diversion from the channel will occur, but the landowner has a right to use or permit such dams for the purpose of erosion control, where they do not divert water from the channel or from the diversion works of another appropriator. It is shown that if the erosion is permitted to continue the water would be drained from the lands bordering on the creek and they would become dry and worthless.

The decree of adjudication did not fix the time of the irrigation season. We think that under these circumstances it would be fair to consider the irrigation season from the time that water was available and could be beneficially used for irrigation to the time when it is not available or could not be used beneficially for irrigation. It is necessary to fix the time of the irrigation season in order to properly measure the water used by the appropriator.

■ The relator failed to prove the essential allegation of the information, that he did not secure the

sixty-three acre feet to which he was entitled under his 1885 priority in 1938. Mr. Johnson commenced irrigating in March and his water was not measured until after about May 12, 1938. Mr. Johnson was merely guessing at the amount of water he received. The adjudication decree not fixing the dates of the irrigation season, we think the water that he used after March, 1938, should have been measured and computed in estimating the amount he received under his 1885 priority for the year 1938 in order to sustain his claim for damages for that year.

For the reasons stated, the judgment of the lower court is reversed and the cause is dismissed for want of evidence.

KELLY and BAILEY, JJ., not sitting.