## VANDEHEY ET AL, *Appellants, v.*
## WHEELER ET AL, *Respondents.*

499 P2d 1319
507 P2d 831

26

*Thomas J. Moore,* Hillsboro, argued the cause for appellants. With him on the briefs were Brink & Moore, Hillsboro.

*John W. Osburn,* Solicitor General, Salem, argued the cause for respondents. With him on the brief was Lee Johnson, Attorney General, Salem.

Before SCHWAB, Chief Judge, and LANGTRY and THORNTON, Judges.

SCHWAB, C. J.

In this declaratory judgment proceeding, which is equitable in nature, plaintiffs are three Washington County farmers who hold water permits entitling them to appropriate a set amount of water for irrigation. Defendants are the State Engineer and District Watermaster who issue such permits and regulate their use. Defendants have demanded that plaintiffs repair or reconstruct a dam in order to continue to appropriate water under their permits. Plaintiffs, arguing they have no obligation to do so, appeal from an adverse judgment in the circuit court.

In order to discuss the merits of this dispute, it is first necessary to describe the topography involved. The diagram on the following page may facilitate this description.

In the area here involved West Dairy Creek flows generally west to east, i.e., originating west of point A and terminating east of point E where it

empties into the Tualatin River. The parties agree that: (1) for about the first 20 or 30 years of this century the creek flowed from A to B to C to D to E; (2) now the creek follows its old course between points A and B, and between points D and E; and (3) now at point B the water in the creek divides, with most of it following the route of B to G to D, and the rest following the part of its original course of B to C to D.

Plaintiffs refer to the stretch from B to G to D as an unnamed channel that forks from West Dairy Creek at point B and rejoins it at point D. As best we understand them, defendants refer to the stretch from F to G to D as an unnamed channel, and the stretch between B and G as a diversion ditch. For purposes of discussion, however, these different characterizations are easy to resolve, since all parties seem to agree that the stretch between F and G is almost always a dry bed. Thus, as far as actually tracing the usual flow of the water, we believe plaintiffs' description is more accurate, and will use their terminology, i.e., refer to the B-G-D stretch as the unnamed channel.

There are two dams on the unnamed channel; Dam #1 is located generally east of point B and Dam #2 is located generally west of point D.

Dam #2 was constructed and is maintained by plaintiffs under water permits that enable them to create a reservoir north of that dam. The plaintiffs draw water from this reservoir to use for irrigation. Plaintiffs' property lies on both sides of the unnamed channel, with most of it being north thereof. Persons other than plaintiffs also own property along the unnamed channel. The channel flows through these persons' property before reaching plaintiffs' property.

Dam #1 was constructed by persons not parties

to this litigation. From the record before us it is impossible to determine exactly why it was constructed. Dam #1 is on the property of a farmer who is not a party in this case.

Plaintiffs have two types of water permits. Their original permits, with priority dates of October and December 1949, entitle them to appropriate set amounts of water from West Dairy Creek.① The second group of permits entitle plaintiffs to store the water appropriated under the 1949 permits in a common reservoir, and to use the water from their reservoir for irrigation. This second group of permits has priority dates of December 1954, and March 1955.

Both the 1949 permits and the 1954-55 permits designate the same "diversion point," which as we understand it, is at point B.②

It is the position of defendants that plaintiffs

---

① More specifically, the permits provide: (1) plaintiff Vanderzanden has a right to use the waters of "West Fork of Dairy Creek and an unnamed lake"; (2) plaintiff Vandehey has a right to use the waters of "West Dairy Creek"; and (3) plaintiff Spiering has a right to use the waters of "West Fork of Dairy Creek."

② Typically, these permits read as follows:

"The point of diversion is located in the SW¼ SE¼, Section 7, Township 1 North, Range 3 West, W.M. & SW¼ NE¼, Section 13, Township 1 North, Range 4 West, W.M."

There is no explanation in the trial court record as to exactly what this technical language means. In their brief plaintiffs tell us it translates to mean what we have called point B on the above diagram. Since the defendants' brief does not disagree, we proceed on the assumption this is accurate.

Although the record is far from a model of clarity, apparently between obtaining their original permits in 1949 and constructing Dam #2, thereby creating their reservoir, in about 1954, each of the plaintiffs pumped water from the unnamed channel at separate points where the channel passed through his respective property. Their collaboration on constructing Dam #2 and the reservoir was designed to make each plaintiff's irrigation operation more economical.

must repair or replace—apparently the latter would be more economical—Dam #1 and maintain it in such a way that no more water passes it than the aggregate they are entitled to appropriate under their 1949 water permits. Defendants wish to have this done so that a larger percentage of the water reaching point B will follow the old West Dairy Creek channel to point D, thus being available for use by riparian owners on the part of the old channel between B and C and D. *See,* n 3, infra.

What now happens is the surplus of water flowing through the unnamed channel, i.e., the amount over and above that to which plaintiffs are entitled under their 1949 permits, flows past Dam #2, rejoining West Dairy Creek at point D. Therefore, this amount of water bypasses the riparian owners on the old channel (B-C-D) and is not available for their use.

While the defendants' goal may be a laudable one, whether they can require plaintiffs to replace Dam #1 presents a question of defendants' statutory authority. The relevant statutes provide:

"The owners of any ditch or canal shall maintain to the satisfaction of the State Engineer a substantial headgate at the point where the water is diverted. It shall be of such construction that it can be locked and kept closed by the watermaster." ORS 540.310 (1).

"If any owner of irrigation works refuses or neglects to construct and put in headgates, flumes or measuring devices, as required under ORS 540.310, after 10 days' notice, the watermaster may close the ditch, and it shall not be opened or any water diverted from the source of supply, under the penalties prescribed by law for the opening of headgates lawfully closed, until the requirements of the State Engineer as to such headgates, flumes

or measuring devices have been complied with." ORS 540.320.

To apply these statutes to the facts at bar, it is first necessary to define certain terms: (1) natural watercourse; (2) irrigation ditch or canal; and (3) diversion point. There do not appear to be any statutory definitions of these terms, but they have settled meanings in the cases.

■ (1) A "natural watercourse" has been defined as a current of water in a channel, and as a living stream with reasonably defined banks. *See, Fitzstephens v. Watson et al,* 218 Or 185, 344 P2d 221 (1959); *Levene et ux v. City of Salem,* 191 Or 182, 229 P2d 255 (1951). A natural watercourse has a definite and at least periodic source of water supply, but there need not necessarily be a flow of water in its channel at all times. *See, Wellman et ux v. Kelley and Harrison,* 197 Or 553, 252 P2d 816 (1953).

■ (2) A "ditch or canal," ORS 540.310, or "irrigation works," ORS 540.320, are artificial man-made water conduits. They are made by excavation or other means of construction, and are designed to divert a flow of water to areas where it would otherwise not flow because of the configurations of the land. *Mancini v. DeLillis,* 1 NJ Super 490, 65 A2d 90 (1948); *cf., Appleton et al v. Oregon Iron & Steel Co.,* 229 Or 81, 358 P2d 260, 366 P2d 174 (1961). Unlike some natural watercourses, all ditches and canals are capable of being owned, *cf., Washburn v. Inter-Mountain Mining Co.,* 56 Or 578, 109 P 382, 12C Ann Cas 357 (1910), as witnessed by the use of the term "owner" in ORS 540.310 and 540.320.

■ ■ (3) Water is "diverted" when its flow is turned from the course it would otherwise follow. Thus,

water can be diverted from one natural watercourse to another natural watercourse, *see, Brattain v. Conn.,* 50 Or 156, 91 P 458 (1907), or from one artificial water conduit to another artificial water conduit. The most common use of the term, however, is when water is diverted from a natural watercourse to an artificial conduit. *See, Boyce v. Killip,* 184 Or 424, 198 P2d 613 (1948); *State ex rel Johnson v. Stewart,* 163 Or 585, 96 P2d 220 (1940); *In Re North Powder River,* 75 Or 83, 144 P 485, 146 P 475 (1915). We believe the term "diverted" in ORS 540.310 and 540.320 is used in this latter sense, as indicated by the phrase, "diverted into the ditch from the stream," in ORS 540.310 (2). Thus, for purposes of applying those statutes, a person's "diversion point" is the point at which he causes water that would otherwise flow in a natural watercourse to instead enter an artificial conduit.

When these definitions are incorporated into the statutes in question, ORS 540.310 (1) and 540.320, the rule those statutes express can be paraphrased as follows: A person can be required to construct a head-gate at his diversion point, that is, at the point where he diverts water from a natural watercourse into some artificial conduit. Plaintiffs argue their diversion point is at Dam #2 where they divert water from the unnamed channel (B-G-D), which they consider to be a natural watercourse, into their reservoir. Defendants argue plaintiffs' diversion point is where the unnamed channel, which they consider to be an artificial conduit, forks from West Dairy Creek, i.e., point B.

Resolution of this dispute as to the location of plaintiffs' diversion point turns on the ultimate question of whether the unnamed channel is a natural

watercourse or an artificial conduit. If the unnamed channel is a natural watercourse, then plaintiffs' diversion point, as we have defined that term, is necessarily at Dam #2. On the other hand, if the unnamed channel is an artificial conduit, then it would follow that plaintiffs' diversion point is at point B.

The evidence establishes that the unnamed channel (B-G-D) is a natural watercourse. Some time in the 1920's or 1930's, winter flood waters in West Dairy Creek caused a washout of the creek bank at point B, creating the unnamed channel that rejoined West Dairy Creek at point D. Several witnesses suggested the possible reason for the washout was that the old channel (B-C-D) had become clogged with fallen trees and other debris.

Current and prior property owners in the area testified that for many years the unnamed channel has had a well-defined channel and banks. When it was originally formed, water flowed in the unnamed channel only during periods of high water. As the old channel of West Dairy Creek (B-C-D) became increasingly obstructed, a higher percentage of the water entered the unnamed channel and the flow therein became more permanent. At the time of trial (July 1971), water was flowing through the unnamed channel, but little if any through the old West Dairy Creek channel (B-C-D).

■ Under the authorities defining a natural watercourse, cited above, we conclude the unnamed channel (B-G-D) is a natural watercourse. Although defendants have consistently referred to the unnamed channel as a man-made diversion ditch, we find nothing in the record that supports their characterization.

It follows that under ORS 540.310 and 540.320

plaintiffs cannot be required to replace Dam #1, because it is not located at their diversion point.

As best we understand them, defendants claim additional statutory authority to require the replacement of Dam #1. They rely on:

"Each application for a permit to appropriate water shall set forth * * * the source of water supply * * *." ORS 537.140 (1)(a).

"An application may be approved * * * upon terms, limitations and conditions necessary for the protection of the public interest * * *." ORS 537.190 (1).

Defendants rely on ORS 537.140 (1) (a) because plaintiffs' applications for water permits and water permits themselves all designate point B as their point of diversion. *See,* n 2, supra. Defendants apparently argue we should regard this designation in the applications and permits as conclusive for purposes of applying ORS 540.310 and 540.320.

We decline to do so. "Diverted" is a term of art in water law, and in the absence of any indication to the contrary we must assume the legislature used it in its technical sense in ORS 540.310 and 540.320. And as stated above, plaintiffs' point of diversion, as that term is properly defined, is at Dam #2. Nothing to the contrary in plaintiffs' applications or permits can change that conclusion, which is based on the legal definition of "diverted." The designation of plaintiffs' diversion point in their applications and permits must be regarded as something akin to either a unilateral or mutual mistake of law.

Furthermore, the record establishes that plaintiffs never filled in the technical description of their diversion point, *see,* n 2, supra, on their water permit

applications. Instead, plaintiffs testified they relied on and deferred to various state and federal engineers to handle these details, being unfamiliar with such technical matters themselves. This makes it inappropriate to give any conclusive effect to the language of the applications or permits.

Defendants rely on ORS 537.190 (1) because one of the three plaintiffs, a Mr. Spiering, has a water permit subject to the following condition:

"That the diversion works shall include an in-line flow meter, a weir, or other suitable device for measuring the water to which the applicant is entitled.

"That the type and place of the measuring device be approved by the watermaster before the beginning of construction work and that the weir or measuring device be installed under the general supervision of said watermaster."

■ Even assuming the reference to a "measuring device" is broad enough to require Mr. Spiering to construct a dam, we nevertheless believe defendants' reliance on ORS 537.190 (1) is misplaced for two reasons. First, we seriously doubt that the general language of ORS 537.190 (1) authorizes the State Engineer to condition a water permit on the construction of a dam in a natural watercourse, which is what we have concluded the unnamed channel to be. Second, we believe conditions to *protect* the public interest means conditions designed to, as much as possible, preserve the natural status quo as far as the flow of water so that the rights of lower riparian owners will be protected. But defendants' demands in this case go much further than that; instead of seeking to preserve the natural status quo, defendants are attempting to make the plaintiffs restore the status quo

ante so that water flows in the way it did before the cutting action of flood waters created the unnamed channel.[9] We do not believe the language of ORS 537.190 (1) or the condition imposed on Mr. Spiering's permit enables them to do this.

Reversed and remanded for entry of a decree in accordance with this opinion.

### ON PETITION FOR REHEARING

---

[9] When cross-examined by plaintiffs' counsel, the Watermaster (defendants' only witness on material issues) testified as follows:

"Q * * * [Y]ou are aware of the fact that the old channel of West Dairy has been filled in?

"A It is getting plugged up, yes.

"Q And this is not the act of any one person; it is an act of nature, isn't it?

"A I would assume so, yes.

"Q And what you are doing, your position is, then, that my clients, the plaintiffs, should build a dam to force the water through the old channel?

"A Right.

"Q * * * * * *

In other words, you want my clients to overcome this act of nature that has been filling in the old channel?

"A Right."

There is no explanation in the record as to why the riparian owners on the old channel (B-C-D) have not or will not attempt to clean out the old channel to alleviate this problem. The only mention of this possibility during the trial was made by defendants' counsel:

"* * * The State Engineer has no authority to require anyone to clean out or to eliminate debris or growth in a natural stream."

*Thomas J. Moore,* Hillsboro, argued the cause for appellants. With him on the briefs were Brink & Moore, Hillsboro.

*John W. Osburn,* Solicitor General, Salem, argued the cause for respondents. With him on the brief was Lee Johnson, Attorney General, Salem.

Before SCHWAB, Chief Judge, and LANGTRY, FOLEY, FORT and THORNTON, Judges.

FOLEY, J.

This is a declaratory judgment proceeding in which plaintiffs are three Washington county farmers who hold permit water rights with a priority of 1949 to the waters of West Dairy Creek. They seek to enjoin the defendants State Engineer and Watermaster from enforcing what they claim to be defendants' requirement that plaintiffs repair and maintain plaintiffs' diversion works at "Dam A," hereinafter described. They also seek to enjoin defendants from denying them the right to appropriate water under their water rights pending such repair.

The principal issue centers around what is plaintiffs' point of diversion. A general diagram showing the dams and direction of flow of watercourses will be helpful.

Plaintiffs claim that the original point of diversion set by them in their application for water rights and subsequent permit has been changed by reason of the claimed fact that the natural flow of West Dairy Creek has been altered by time and circumstances so that the natural flow of West Dairy Creek is now the unnamed channel which proceeds through the plaintiffs' property and that actually plaintiffs' point of diversion is now where they pump the water out of the reservoir behind "Dam B."

Defendants contend that "Dam A" was constructed

as part of a plan to divert water from West Dairy Creek for the benefit of the plaintiffs and what plaintiffs call their "natural watercourse" is, in fact, an improved diversion ditch. Defendants contend what they have required the plaintiffs to do is to install and maintain a sufficient headgate and measuring device to regulate and measure the water appropriated from West Dairy Creek at the point denominated by plaintiffs as their point of diversion in their permit for direct flow diversion of the waters of West Dairy Creek. The trial court made findings of fact and concluded that the defendants State Engineer and Watermaster's contentions were correct and found that the plaintiffs were not entitled to any relief in this proceeding. We affirm.

A brief review of law concerning the appropriation of water in Oregon will assist in understanding this controversy. In 1909 the legislature of the state of Oregon adopted a water code (now ORS ch 537) in which it was declared that all waters within the state from all sources of water supply belong to the public and that, subject to existing rights, all waters within the state might be appropriated for beneficial use and not otherwise. The water code then provided how the waters so appropriated to beneficial use should be established as water rights by providing procedures therefor and making the office of the State Engineer the index of the rights and their priorities and giving the State Engineer the authority, subject to established priorities, to cause the diversions or deliveries to be regulated so that the water would be delivered fairly to those entitled. There was thus a central index in the state where one could go to determine from records the precise water right on a given tract of land including the type of use, such as for direct flow

Section 13 . Section 18

To Tualatin River

Dam B

Pump

Reservoir

Dam A

Watercourse

West Dairy Creek

Original point of
diversion of plaintiffs
Vandehey & Vanderzanden

irrigation, storage, domestic, municipal, industrial, etc., and precisely the quantity and where and how the water was to be diverted.

The water code also provided that a water user desiring to do so could apply to the State Engineer for a change in the type or character of use or change in point of diversion or place of use by an application to be processed through administrative procedures in his office (now ORS 540.520). The term "point of diversion" thus became a term of art, having the technical meaning under the water code of the place designated by a permittee in his application for water rights and ultimately in the water certificate itself.

■ Prior to 1949 plaintiffs had no right to appropriate water from West Dairy Creek. In that year they decided to exercise their right to appropriate water, pursuant to the water code, and each applied for and received a permit to appropriate water directly from West Dairy Creek. These appropriation permits are later in time and inferior in right to those of other appropriators of water from West Dairy Creek who are not parties to this proceeding, some of whose diversions are below plaintiffs' diversion on West Dairy Creek, and whose prior rights may be affected by a change in plaintiffs' point of diversion.[1] A change in point of diversion cannot be made if it will injuriously affect other users on the stream. *Hutchinson v.*

----

[1] Plaintiff Vanderzanden was aware of the superior rights of the lower users on West Dairy Creek even before the construction of "Dam A." At plaintiffs' present point of diversion he dug a trench to divert the water from West Dairy Creek into the unnamed channel in 1953. Upon remonstrance by the owner of a higher priority water right on West Dairy Creek just below plaintiffs' present point of diversion, plaintff Vanderzanden sandbagged the channel he had dug. It was this channel which plaintiff Vanderzanden dug and the rest of the unnamed watercourse, which plaintiffs now claim to be a natural watercourse.

*Stricklin,* 146 Or 285, 299, 28 P2d 225 (1933). Each permit which was granted to plaintiffs described the point of diversion from which water would be taken from West Dairy Creek. Vandehey's and Vanderzanden's diversion points were in Section 13, which is at "Dam A" on the diagram and the location of the present diversion works. Spiering's point of diversion was Section 18, a point which is below, or downstream, from "Dam B." In 1968 plaintiff Spiering petitioned the State Engineer for and was allowed a change in his point of diversion from Section 18 to Section 13, so that his point of diversion would coincide with that of Vandehey and Vanderzanden in Section 13. Thus, in this case, all of the relevant water rights of the plaintiffs to appropriate water from West Dairy Creek describe a point of diversion on West Dairy Creek in Section 13, which is the site of "Dam A."

In 1954 the plaintiffs made a joint application for a reservoir permit authorizing them to impound and store water for the purpose of irrigation. The permit described the source of water to be impounded as West Dairy Creek and referred to the unnamed channel as a diversion ditch. As a result of the allowance of the application there was constructed what plaintiffs call "Dam B" which allows plaintiffs to impound and store water from West Dairy Creek. Plaintiffs' point of diversion was not changed by the 1954 permit and it did not change the obligation of the defendants to see that the flow of water at plaintiffs' point of diversion in Section 13 was properly regulated. For this purpose defendants have required that the plaintiffs maintain control and measuring devices at "Dam A" in order that the defendants State Engineer and Watermaster may regulate and measure the flow of water to plaintiffs. It is defendants' contention that they

are merely enforcing the conditions of plaintiffs' water rights which restrict plaintiffs' rights to appropriate water to specified amounts and require regulation of the amount of water appropriated. Plaintiffs' principal contentions are that their water could be as well measured at the point where they receive it into "Dam B" and that they, in fact, have changed their point of diversion without going through the administrative process because the unnamed channel has become a natural stream and therefore their diversion really is at the point where the natural stream enters their impoundment.[2]

■■ ORS 540.310 requires that a control or measuring device be installed at the point where the water is diverted. The construction of "Dam A" apparently was the result of compliance with this statute.[9] (Plaintiff Vanderzanden was a party to the construction of

---

[2] If plaintiffs' contention is correct the result would be not only to change their point of diversion, but also to change the *source* of the irrigation water. The source is designated in the water certificates as being from West Dairy Creek. Not until events leading to this suit have plaintiffs maintained that their source was anywhere but West Dairy Creek. If plaintiffs were to apply for a new source they would have to make new applications for water rights and would lose their present priority. There is no statutory provision for a transfer of the source. If such an application were made, then the State Engineer for the *first time* in this matter would have before him the question of whether the unnamed channel was a natural stream and he could make his investigation and compile the necessary data accordingly.

[9] The State Engineer in this situation is not authorized to require the building of a dam, as such, but only to require construction and maintenance of a headgate and measuring devices so that he can measure and control the amount of water which the permittee is actually diverting from the stream. A dam might be the logical means to be employed by the appropriator but whatever means the appropriator might employ to restrain the flow of water so that it would be delivered through a headgate with a proper measuring device installed would comply with the statute.

"Dam A" but who built the dam or who owns the land on which it is constructed is not relevant to this proceeding.) It is the responsibility of one who applies for and obtains a water right to see that a proper control mechanism and measuring device is provided. "Dam A" was the control and regulating works when the State Engineer made his survey in 1958. Whether the unnamed channel became a natural stream also is immaterial to this case.[4] The plaintiffs' point of diversion for the waters of West Dairy Creek is the location set forth in their respective water certificates and the unnamed channel is merely a conduit used to convey the water to plaintiffs' places of use. The use of a natural stream as a conduit for diverted water is not uncommon under Oregon water law. *See In re Waters of Deschutes River,* 134 Or 623, 286 P 563, 294 P 1049 (1930), *appeal dismissed* 290 US 590 (1933).

As mentioned above, an administrative procedure is provided by statute for the owner of a water right to change his point of diversion, ORS 540.520, by filing an application to do so with the State Engineer.[5] The

[4] The trial court found that the unnamed channel had not become the natural channel. The court said:

"The plaintiffs contend that the unnamed channel has become the natural channel and that their rights are at the point of their dam at the site of the reservoir.

"This contention is not well taken. The rights of plaintiffs originate at the diversion point, i.e., at or near the West Dairy Creek. A headgate and measuring device at this point will determine the amount of water being diverted to the unnamed channel and into the reservoir. It will also insure that users downstream with prior rights will not be jeopardized."

[5] Oliver v. Skinner and Lodge, 190 Or 423, 436, 442, 226 P2d 507 (1951), recognizes the procedure. It holds that the scope of the first appropriation is the measure of the right. If there are problems about the rights involved in a change in point of diversion "* * * [they] should properly have been submitted to the state engineer in support of an application for permission to change the point of diversion * * *."

statute further provides that notice of the proposed change be published in a newspaper in the county where the rights are located so that others affected by such change may appear at a hearing to be held thereon and that the State Engineer will then proceed to make a determination as to whether or not the change can be effected without injury to existing rights. If the plaintiffs had followed this procedure in this case, other affected water right holders would have had an opportunity to object to a change in point of diversion if it adversely affected the enjoyment of their water rights. That plaintiffs were aware of this procedure is shown by plaintiff Spiering's compliance with the procedure in making his change in point of diversion in 1968.[6]

■ In summary, this is a declaratory judgment proceeding in which the plaintiffs seek to have the court change their point of diversion from that specified in their permits without going through the statutory procedure for change in point of diversion and, consequently, without notice to other water users who may be prior in time and right to the plaintiffs. For the reasons herein set forth, we agree with the trial court that the plaintiffs are not entitled to the relief requested.

Former opinion withdrawn.

---

[6] Oregon's procedure is not unique in requiring an appropriator to secure the approval of an administrative body before changing the point of diversion.

"It is often provided by statute that an appropriator wishing to make a change in his point of diversion * * * shall first make application or petition to, and obtain the approval or permit of, a designated officer or tribunal. Such statutes have been enacted for the purpose of avoiding confusion and perfecting or preserving the record of water rights, and to put a stop to a multiplicity of actions because of such changes. * * *" 93 CJS 977, Waters § 189.

SCHWAB, C.J., dissenting.

I would adhere to our former opinion in this case. *Vandehey v. Wheeler,* 13 Or App 25, 499 P2d 1319 (1972).

Specifically, I disagree with the majority in the following particulars.

Plaintiffs do not seek "to have the court change their point of diversion," as the majority asserts. The Watermaster directed plaintiffs to repair or replace what the majority calls Dam A at plaintiffs' expense. The Watermaster stated he would terminate plaintiffs' rights to appropriate water if they did not do so. As the prayer for relief in plaintiffs' complaint makes clear, they seek a declaration that they do not have to comply with the Watermaster's demands, and an injunction against the Watermaster's following through on his stated intentions.

This presents the question of interpreting and applying ORS 540.310(1), which provides:

"The owner of any ditch or canal shall maintain to the satisfaction of the State Engineer a substantial headgate at the point where the water is diverted. It shall be of such construction that it can be locked and kept closed by the watermaster."

This statute would require plaintiffs to repair or replace Dam A if it is "at the point where the water is diverted."[1]

The majority concludes that for purposes of applying ORS 540.310(1), plaintiffs' water is diverted at "the place designated by a permittee in his applica-

---

[1] Only a dam that would completely block the unnamed channel would be a "headgate * * * of such construction that it can be * * * kept closed by the watermaster" within the meaning of ORS 540.310 (1). *But see* n 3 of the majority opinion.

tion * * * and ultimately in the water [right] certificate itself."[2] I would define "the point where * * * water is diverted" as that point at which the natural flow of water is, in fact, physically diverted by some act of man. This definition is at least implicit in the water code[3] and in prior Oregon cases.[4] I find nothing in the water code that supports the majority's definition.[5]

The majority states that whether the unnamed channel is a natural watercourse or a "ditch or canal," within the meaning of ORS 540.310(1), is "immaterial." That is the most material issue in applying ORS 540.310(1) and what I believe to be the proper definition of diversion point to the facts at bar. All parties have treated that issue as material from the filing of pleadings through the filing of petitions for rehearing. In fact, most of the evidence at trial went to that issue.

The record clearly establishes in my mind that the unnamed channel is now a natural watercourse,

---

[2] If the majority is suggesting that a permittee "designates" any of the contents of a water right certificate, I disagree. Water right certificates are prepared and issued by the State Engineer. *See,* ORS 537.250 (1).

[3] ORS 540.310(1) requires construction of a headgate where water is diverted into an irrigation ditch or canal, i.e., where the natural flow is diverted into a man-made channel.

[4] *See,* e.g., Hutchinson v. Stricklin, 146 Or 285, 297, 28 P2d 225 (1933):
"To the valid appropriation of water three elements must exist: (1) Intent manifested to appropriate to some beneficial use existing at the time or contemplated in the future; (2) *a diversion from the natural channel by means of a ditch, canal or other structure*; (3) the application of it within a reasonable time to some useful industry * * *." (Emphasis supplied.)

[5] In some circumstances, water right certificates are conclusive as to *priority* and *extent* of appropriation. *See,* ORS 537.270; Cleaver v. Judd, 238 Or 266, 393 P2d 193 (1964). The water code gives no such conclusive effect to a diversion point designation.

and probably was such in 1949; the majority apparently does not conclude to the contrary. Thus, it is legally impossible for plaintiffs' diversion point to be at the place stated in their water right certificates. No act of man diverts any water into the unnamed channel at the fork of West Dairy Creek and the unnamed channel. No act of man diverts any water *toward* plaintiffs at Dam A. The only thing Dam A does is divert water that would otherwise naturally flow down the unnamed channel back into the original channel of West Dairy Creek. Plaintiffs' diversion point is where they, in fact, physically divert water from the natural flow, i.e., at Dam B. Therefore, ORS 540.310(1) does not authorize the Watermaster to require plaintiffs to repair or replace Dam A.

Such a holding would, incidentally, result in a change in plaintiffs' diversion point. However, I fail to see how this could possibly prejudice any of plaintiffs' neighbors. Respective water rights depend upon *extent* of appropriation authorized and *priority date*. A change in diversion point, made incidentally to granting other judicial relief, could not possibly affect those material ingredients of water rights.[9]

ORS 540.310(1) and other provisions of the water code require persons appropriating water to construct devices that enable the Watermaster to measure and regulate the amount of water they appropriate. These plaintiffs have offered to construct control and regulation devices that fully comply with this

[9] The majority emphasize what they consider to be the importance of the designation of plaintiffs' diversion point in the public records on file with the State Engineer. Anyone consulting those records would learn that plaintiffs' diversion point is located "in the SW ¼ NE ¼, Section 13, Township 1 North, Range 4 West, W.M." I doubt that this information is sufficiently precise to ever be very useful to plaintiffs' neighbors.

requirement.[7] Instead, the Watermaster insists that Dam A be repaired or replaced. His testimony makes it clear to me that he is making this demand in an effort to force the water that flows naturally into the unnamed channel back into the original channel of West Dairy Creek, not because of any real desire to measure or regulate, at Dam A, the amount of water plaintiffs are appropriating. In my opinion, plaintiffs are entitled to a judicial determination that ORS 540.310(1) does not require them to alter a natural flow of water, even though this may incidentally result in a change in their diversion point.[8]

For the foregoing reasons, in addition to those stated in our former opinion, I dissent.

---

[7] ORS 540.340(1) provides:

"Whenever it may be necessary for the protection of other water users, the State Engineer shall require every owner or manager of a reservoir or diversion dam, located across or upon the bed of a natural stream, to construct and maintain a suitable outlet in the reservoir or diversion dam which will allow the free passage of the natural flow of the stream. The State Engineer shall determine what constitutes a suitable outlet."

Apparently with this statute in mind, plaintiffs' complaint alleges:

"* * * [P]laintiffs are agreeable to installing a measuring device on said stream [the unnamed channel] above their reservoir [i.e., above Dam B] and a measuring device below their reservoir to assist the Watermaster in determining the amount of water to which plaintiffs are entitled and are appropriating * * *."

[8] Plaintiffs should not be denied relief on the grounds that they did not exhaust the administrative remedy supposedly available to change their point of diversion. I find nothing in the pleadings or record that raises any question of exhaustion of remedies. Moreover, it is not clear to me that ORS 540.520 creates an administrative remedy that is applicable to this situation, i.e., where the plaintiffs claim, in effect, that their diversion point was never actually at the place stated in their water right certificates.